[No. 47001–4.   En Banc.   December 31, 1980.]

*In the Matter of the Personal Restraint of* RICKY ANTHONY YOUNG, *Petitioner.*

*Fredrickson, Maxey, Bell & Stiley, Inc., P.S.,* by *Carl Maxey,* for petitioner.

*Slade Gorton, Attorney General,* and *David R. Minikel, Assistant,* for respondent.

ROSELLINI, J.—The petitioner was convicted of arson in 1974, the conviction being affirmed in *State v. Young,* 87 Wn.2d 129, 550 P.2d 1 (1976). In 1976, he was convicted of first degree homicide, and an appeal in that case also resulted in affirmance. *State v. Young,* 89 Wn.2d 613, 574 P.2d 1171 (1978). He is presently serving the sentence imposed in the arson case. When he is discharged from that offense, he will begin serving the homicide sentence.

The petitioner was initially confined in the state penitentiary at Walla Walla. On August 21, 1979, he was placed in administrative segregation. On August 28 of that year, he was given a hearing of sorts, but according to his uncontroverted allegations, he was not advised of the conduct upon which the segregation order was based nor was he permitted to give evidence in his own behalf. He was told that he was a "negative leadership influence on the population and a threat to the security of the institution." His appeals to the acting warden and the Department of Social and Health Services were denied.

The petitioner remained in administrative segregation until September 28, 1979, when, without prior notice, he was transferred to the federal penitentiary at McNeil Island, where he immediately went on a hunger strike. Because of this conduct, he was returned to the custody of

state prison authorities and, on October 6, was placed in the corrections center at Shelton, where he began another hunger strike.

In the meantime, a classifications representative of the state institution had applied to corrections authorities in Tennessee for an exchange of prisoners, including the petitioner. The exchange was successfully negotiated, and on November 16, 1979, the petitioner was sent to and incarcerated in that state.

One year later, while this petition was pending in this court, the petitioner was again transferred, this time to a penal facility at Phoenix, Arizona. We were advised by the Attorney General at the hearing on this petition that the most recent transfer was occasioned by the fact that one of the petitioner's fellow transferees had successfully contended in the courts of Tennessee that prison officials there had no authority to accept prisoners from a sister state. Arizona, we understand, is a party to a contract entered into pursuant to the Western Interstate Corrections Compact (authorized in RCW 72.70) and has such authority.

■■ In support of this contention, the petitioner contends (1) that he is entitled under the laws of this state to be confined in institutions within the state, and specifically within the state penitentiary at Walla Walla; (2) that if he does not have that right, he at least has that right, under the due process clauses of the state and federal constitutions, to be given a hearing before being transferred to another institution; and (3) that the transfers to which he was subjected violated his constitutional right of access to the courts. He cites RCW 9A.20.020, which provides that a person convicted of a felony shall be punished by imprisonment in a state correctional institution. This section must be read together with RCW 72.13.120, which provides that every person convicted of an offense punishable by imprisonment in the state penitentiary shall, notwithstanding any inconsistent provision of the law, be sentenced to imprisonment in a penal institution under the jurisdiction of the Department of Social and Health Services without

designating the name of such institution, and that place-ment shall be in the discretion of the Secretary of the Department. It must also be read in conjunction with RCW 72.68.010, .040, and RCW 72.70, providing for transfers to other institutions within and without the state, all of which provisions were in effect when RCW 9A.20.020 was enacted and when the petitioner was convicted.

Read together, these provisions reveal a legislative intent that a person convicted shall initially be sent to a state institution, and that thereafter he may be transferred to other institutions in accordance with the statutory provisions.

It is also argued that because the legislature has required the Secretary of Social and Health Services to provide corrective, rehabilitative, and reformative programs (RCW 72.08.101), it was its intent that all persons convicted in this state should have the benefit of those programs throughout the duration of their prison terms. Again, the section must be read together with other statutes, which we have cited. Those statutes contemplate both intrastate and interstate transfers. Giving effect to all of the pertinent statutes, we find an intent to require these programs for the benefit of the prison population generally, and to serve society's interest in the rehabilitation of criminals, rather than to vest any right in individual prisoners. Furthermore, RCW 72.70, pursuant to which the petitioner is presently confined in Arizona, contemplates that the receiving state shall provide rehabilitation and treatment. RCW 72.70.010, arts. 1, 4(a). So it is evident that the legislature did not abandon its concern for the reformation and rehabilitation of prisoners when it provided for their transfer to prisons in other states.

The major thrust of the petition centers around a second contention—that the constitutional due process clauses require that a prisoner be given a hearing before he is transferred to another state.

Persons sentenced to incarceration necessarily lose many of the rights and privileges of ordinary citizens, "a

retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 92 L. Ed. 1356, 68 S. Ct. 1049 (1948); *Wolff v. McDonnell*, 418 U.S. 539, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). As the Supreme Court said in *Wolff*, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. Among the rights retained are substantial religious freedom, the right of access to the courts, and the right to be protected from invidious race discrimination. *See* the cases cited in *Wolff*, at page 556. It was held in *Wolff* that prisoners may not be deprived of life, liberty, or property without due process of law. They are not, however, entitled to the full panoply of rights due a defendant in a criminal proceeding, but rather such process as is appropriate in the circumstances. The court said that there must be mutual accommodation between institutional needs and objectives and the provisions of the constitution that are of general application.

The United States Supreme Court in *Wolff* was concerned with the liberty interest which attaches to a prisoner's accumulated "good time" credits. It said that such an interest was not created by the constitution itself, but by the state, which had not only provided for good time but also specified that it was to be forfeited only for serious misconduct. Accordingly, it was held that the prisoner's interest in maintaining his good time credits had "real substance" and was sufficiently embraced within the Fourteenth Amendment liberty to entitle him to the minimum procedures appropriate in the circumstances, sufficient to assure that his state–created right was not arbitrarily abrogated.

The United States Supreme Court has also held that a prisoner has a sufficient liberty interest in parole to entitle him to a hearing before his parole is revoked. *Morrissey v. Brewer*, 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). The court in that case found that the prisoner had a liberty interest, although indeterminate, which included many of the core values of unqualified liberty and that its

termination inflicted a "grievous loss" upon him. Although there was no rule or statute restricting revocation to cases where the conditions of parole had been violated, the court further found "[i]mplicit in the system's concern with parole violations" (*Morrissey,* at 479) the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole. It was held that the prisoner was entitled to a hearing before parole revocation.

Following the United States Supreme Court's lead in this developing area of constitutional law, we have held that minimal due process is required before revocation of probation (*State v. Myers,* 86 Wn.2d 419, 545 P.2d 538 (1976)) and before cancellation of a previously established, tentative parole release date for reasons other than the failure to produce a satisfactory parole release plan. *Monohan v. Burdman,* 84 Wn.2d 922, 530 P.2d 334 (1975).

It will be seen that all of these cases involved the liberty interest associated with conditional liberty or justifiably anticipated release from confinement.

The United States Supreme Court has also found that a certain liberty interest exists within the confines of a prison. In *Haines v. Kerner,* 404 U.S. 519, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972), it held that a prisoner asserted a justiciable claim under the federal Civil Rights Act of 1871 (42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)), when he claimed, *inter alia,* that he had been denied due process in steps leading up to his disciplinary confinement. The court did not discuss the question of what process, if any, is due in those circumstances. Later, in *Wolff v. McDonnell, supra* at 571 n.19, the court said that solitary confinement is reserved for instances where serious misconduct has occurred. The court indicated that the procedures for revoking good time would be required where such discipline is imposed.

Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary

determination of the factual predicate for imposition of the sanction.

*Wolff*, at 572 n.19. Solitary confinement, like parole revocation and cancellation of good time credits, affects the prisoner's physical liberty or freedom from physical constraint.

The court further suggested that some lesser process is due when the punishment embraces only loss of privileges. The last sentence of the *Wolff* footnote revealed that a prisoner may have a "liberty interest" in advantages which do not involve relief from physical restraint.

█ Relying upon this trend in constitutional evolution, prisoners in a number of states have successfully taken to the federal courts their complaints that interstate and intrastate transfers impose "grievous loss" upon those transferred and should be preceded by a hearing. Typical of these is *Gomes v. Travisono,* 490 F.2d 1209 (1st Cir. 1973), *vacated and remanded sub nom.* 418 U.S. 909, 41 L. Ed. 2d 1155, 94 S. Ct. 3200, *modified on reconsideration,* 510 F.2d 537 (1st Cir. 1974).

The reasoning of these cases was rejected by the Supreme Court in *Meachum v. Fano,* 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976) and *Montanye v. Haymes,* 427 U.S. 236, 49 L. Ed. 2d 466, 96 S. Ct. 2543 (1976), both involving intrastate transfers of prisoners.[1] It was contended in *Meachum* that a hearing was necessary where a transfer would place the prisoner in substantially more burdensome conditions than he had been experiencing. The court refused to subscribe to this proposal, saying that not every grievous loss visited upon a person by the state is sufficient to invoke the procedural protection of the due process clause, nor does every change in the conditions of

---

[1]For comments upon these cases, *see* Calhoun, *The Supreme Court and The Constitutional Rights of Prisoners: A Reappraisal,* 4 Hastings Const. L.Q. 219 (1977); Monaghan, *Of "Liberty" and "Property",* 62 Cornell L. Rev. 405 (1977); Comment, *Two Views of a Prisoner's Right to Due Process: Meachum v. Fano,* 12 Harv. C.R.–C.L. L. Rev. 405 (1977); Comment, *Procedural Due Process in Prisoners' Rights: The State Giveth and The State Taketh Away,* 57 B. L. Rev. 387 (1977); Comment, *Due Process Behind Bars—The Intrinsic Approach,* 48 Fordham L. Rev. 1067 (1980).

confinement having a substantial adverse impact on the prisoner involved. "Given a valid conviction, [the court said,] the criminal defendant has been constitutionally deprived of his liberty to the extent that the state may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the constitution." *Meachum,* at page 224.

The United States Supreme Court said further that confinement in any of the state's institutions is within the normal limits or range of custody which the conviction has authorized the state to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

The court noted that transfers between institutions are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate. The court was not willing to find in the United States Constitution a requirement that all such decisions should be preceded by a hearing.

The court then turned to *Wolff v. McDonnell, supra,* upon which the prisoners in *Meachum* relied, saying that it differed from the present case in that the liberty interest there had its roots in state law, and that the due process clause had come into play to protect a state–created right from arbitrary revocation. The court found this concept of prison "liberty" to be consistent with its analysis in other due process cases, such as *Goss v. Lopez,* 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975); *Board of Regents v. Roth,* 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); *Perry v. Sindermann,* 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972); and *Goldberg v. Kelly,* 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970).[2]

---

[2]It is noteworthy that all of these cases were concerned with property interests, rather than liberty interests. *See Meachum v. Fano,* 427 U.S. 215, 49 L. Ed.

Because there was no state law which conditioned transfer upon the occurrence of specified events, the discretion given to prison officials being quite broad, the court could find no basis of entitlement in the Massachusetts law. It was argued that where there are charges of serious misbehavior, there should be a hearing in order that the decision to transfer will not be made on an erroneous basis. Because it found that the prisoners had no legal right or interest in remaining in any one prison, the court held that a prisoner had no basis of complaint if a transfer decision should be based on erroneous findings of fact.

The opinion concluded with this paragraph:

Holding that arrangements like this are within reach of the procedural protections of the Due Process Clause would place the Clause astride the day–to–day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges. We decline to so interpret and apply the Due Process Clause. The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States. *Preiser v. Rodriguez,* 411 U. S. 475, 491–492 [36 L. Ed. 2d 439, 93 S. Ct. 1827] (1973); *Cruz v. Beto,* 405 U. S. 319, 321 [31 L. Ed. 2d 263, 92 S. Ct. 1079] (1972); *Johnson v. Avery,* 393 U. S. 483, 486 [21 L. Ed. 2d 718, 89 S. Ct. 747] (1969). The individual States, of course, are free to follow another course, whether by statute, by rule or regulation, or by interpretation of their own constitutions. They may thus decide that prudent prison administration requires pretransfer hearings. Our holding is that the Due Process Clause does not impose a nationwide rule mandating transfer hearings.

(Footnote omitted.) *Meachum v. Fano, supra* at 228–29.

Three dissenters, in an opinion written by Justice Stevens, said that liberty, unlike property, does not find its source in laws but rather is an inalienable right with which men are "endowed by their Creator." *Meachum,* at 230. Even the inmate, it was said, retains an inalienable interest

2d 451, 96 S. Ct. 2532 (1976) (Stevens, J., dissenting).

in liberty—at the very minimum, the right to be treated with dignity. In a footnote, the dissenting opinion quoted this from the *President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections* 83 (1967):

> 'A substantial portion of our population is affected by the law in this area. Approximately 1.3 million people are at any one time subject to correctional authority; untold millions have criminal records. There is increasing doubt as to the propriety of treating this large group of persons as, in varying degrees, outcasts from society. And there is increasing recognition that such treatment is not in the ultimate interests of society. Denying offenders any chance to challenge arbitrary assertions of power by correctional officials, and barring them from legitimate opportunities such as employment, are inconsistent with the correctional goal of rehabilitation, which emphasizes the need to instill respect for and willingness to cooperate with society and to help the offender assume the role of a normal citizen.' Task Force Report at 82."

*Meachum v. Fano,* 427 U.S. 215, 233 n.6, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976).

*Montanye v. Haymes,* 427 U.S. 236, 49 L. Ed. 2d 466, 96 S. Ct. 2543 (1976), a companion case, was construed to be, like *Meachum,* an application for relief under 42 U.S.C. § 1983 and 28 U.S.C. § 1343. There it was alleged that an intrastate transfer, which was made from one maximum security institution to another of the same security, was made for the purpose of preventing the petitioner from pursuing his judicial remedies and in reprisal for his having rendered legal assistance to various prisoners and having, along with others, sought to petition the court for redress. The federal district court had held that the transfer was within the discretion given to prison officials, and that it was immaterial whether punishment was the motive for the transfer, so long as there was no substantial difference between the facilities at the two prisons. The Court of Appeals for the Second Circuit had ruled the judgment erroneous because there were two unresolved questions of

fact—whether punishment was the motive for the transfer, and whether the effects of the transfer were sufficiently burdensome to require a hearing under the due process clause of the Fourteenth Amendment. *United States ex rel. Haymes v. Montanye,* 505 F.2d 977 (2d Cir. 1974).

On certiorari to the United States Supreme Court, the judgment of the Court of Appeals was reversed, the court holding that the clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive; and that if a hearing is to be required, there must be a showing that the prisoner had a justifiable expectation that he would not be transferred unless found guilty of some misconduct. The court noted that under New York law, adult persons are not sentenced to particular institutions but are committed to the custody of the Commissioner of Corrections, who is empowered to transfer inmates from one correctional facility to another. Further, the transfer of inmates was not conditioned upon or limited to the occurrence of misconduct and transfers were not among the punishments which may be imposed only after a prison disciplinary hearing. The statute imposed no conditions on the discretionary power to transfer, and no such requirements had been administratively promulgated. The case was remanded for further proceedings consistent with the opinion.

The dissenters, Justices Stevens, Brennan and Marshall, expressed the opinion, as they had in *Meachum,* that the question whether a hearing was required should turn on the seriousness of the impact on the inmates' residuum of protected liberty. They found that there was "no grievous" loss[3] entitling the respondent to a hearing.[4]

---

[3]The hardships which may result from a transfer were enumerated in *Montanye v. Haymes,* 427 U.S. 236, 49 L. Ed. 2d 466, 96 S. Ct. 2543 (1976), in a footnote at page 241. These included separation from home and family; separation from friends at the penitentiary and removal to a hostile environment; greater difficulty in contacting counsel; administrative segregation upon arrival; loss of personal belongings; deprivation of medical and psychiatric treatment; interrup-

While the cases of *Meachum* and *Montanye* involved intrastate transfers, the rule which they announced is broad in its terms, and lower federal courts have since recognized that there is no valid basis for distinguishing intrastate from interstate transfers. *See Sisbarro v. Warden,* 592 F.2d 1 (1st Cir. 1979); *Cofone v. Manson,* 594 F.2d 934 (2d Cir. 1979). An interstate transfer may involve a greater loss, simply because of the greater distance from home (assuming the prisoner's home was situated near the first prison, as is the case here). Nevertheless, unless he has some reasonable expectation grounded in state law that he will not be transferred except upon a finding of certain facts, he

---

tion of educational and rehabilitative programs; and adverse inferences which may be drawn by the parole board in noting the fact of transfer on a prisoner's record.

Of course, where a prisoner is transferred for his own protection or welfare, many of the disadvantages which may be present will be outweighed by the advantages of relocation.

[4]The dissenters in *Montanye v. Haymes, supra,* observed that the allegations of the complaint had raised a question whether the purpose of the transfer was to suppress the respondent's attempt to petition the courts. They were of the opinion that such a move would be a violation of his First Amendment rights, whether or not a hearing was granted, and that the matter should be tried. It was their expressed understanding that the court's disposition of the case did not foreclose such a hearing.

A similar contention is raised before this court. It is alleged that the petitioner had been seeking legal advice with respect to his complaints about prison conditions, and was collecting affidavits concerning abuses against prisoners at the Walla Walla prison, with a view to commencing litigation to vindicate the rights of the prisoners there, including himself. Those efforts, it is said, culminated in a suit in the United States District Court for the Eastern District of Washington, *Hoptowit v. Ray,* No. C–79–359.

A judgment has now been entered in that action, and the court has retained jurisdiction and appointed a special master to aid in supervising compliance with orders. The defendants were enjoined in the district court's action from retaliating against plaintiffs for exercise of their right to courts and counsel. Retaliatory *transfers* were enjoined, and the defendants were required to notify the special master and all opposing counsel prior to transferring any prisoner out of the state of Washington. The court ordered that if the master should determine that any transfer was retaliatory, the transfer should not be implemented pending the court's review.

If, as the petitioner alleges, the transfer in this case was made for retaliatory purposes, it is in violation of the federal district court's order, and he has an express and adequate remedy in that court.

does not have a liberty interest in remaining at his place of incarceration under the Fourteenth Amendment's due process clause.

Turning to our own statutes we find that they, like the statutes under consideration in *Meachum* and *Montanye,* lodge a wide discretion in the persons charged with prison management. RCW 72.70.010 (pursuant to which the petitioner is presently incarcerated in Arizona), in its article 4(a), provides:

> (a) Whenever the duly constituted judicial or administrative authorities in a state party to this compact, and which has entered into a contract pursuant to Article III, shall decide that confinement in, or transfer of an inmate to, an institution within the territory of another party state is necessary in order to provide adequate quarters and care or desirable in order to provide an appropriate program of rehabilitation or treatment, said officials may direct that the confinement be within an institution within the territory of said other party state, the receiving state to act in that regard solely as agent for the [s]ending state.[5]

The provision does not condition the exercise of judgment upon a finding of misconduct or any other fact, and no conditions, insofar as we have been shown, have been administratively promulgated. As we have already observed, persons convicted of felonies are not sentenced to a particular institution; rather, their place of confinement is within the discretion of the Secretary of Social and Health Services, who is also given the power to effect transfers.

Thus, it appears that the laws of this state afford a prisoner no reasonable expectation that he will be confined in the state penitentiary so long as he obeys the rules. Accordingly, the petitioner was not entitled to a hearing before transfer under the due process clause of the Fourteenth Amendment. *Meachum v. Fano, supra; Montanye v.*

---

[5]RCW 72.68.010, a companion statute, provides:

"Whenever in its judgment the best interests of the state or the welfare of any prisoner confined in any penal institution will be better served by his transfer to another institution the secretary may effect such transfer."

*Haymes, supra.*

This conclusion does not end the matter, however. The United States Supreme Court was careful to record the fact that its decision was inspired by a concern that the federal courts should not become too deeply involved in supervision of state prisons, and expressly left to the judgment of the legislative, executive and judicial branches of state government the question whether a hearing should be accorded in these circumstances. Thus, not only are we not bound by the decision of the United States Supreme Court in examining the scope of our own due process clause (Const. art. 1, § 3; *see Petstel, Inc. v. County of King,* 77 Wn.2d 144, 459 P.2d 937 (1969)), but we are invited by that court to exercise an independent judgment upon the question.

However, we do not find it necessary to explore that question at this time, inasmuch as the rules and regulations of the Department of Social and Health Services afford the petitioner a remedy which, if administered in good faith, should be adequate to protect him from a transfer decision rendered arbitrarily. It will be remembered that a month before the petitioner was first transferred out of the state, he was subjected to administrative segregation. This move was accompanied by a procedure so perfunctory that even the respondents do not pretend that a hearing was conducted. The petitioner was advised, some days after he was placed in segregation, that he was a "negative leadership influence on the population and a threat to the security of the institution." He was given no opportunity to present evidence on his own behalf, much less to confront witnesses. His appeals within the system were fruitless.

It is evident that in this procedure the prison authorities ignored the rules of the Department of Social and Health Services. WAC 275-82 governs administrative segregation decisions. It provides for the convening of a committee composed of not less than three staff members concerned with the rehabilitation progress of a resident and the program activity to which he is assigned, to consider the question whether administrative segregation shall be imposed.

It specifies the findings necessary to support a decision. Unless the segregation is voluntary, it must be shown that the resident is dangerous to himself, to others, or to the security of the institution, or that he is in danger from others. WAC 275-82-015 requires that when the superintendent is considering the administrative segregation of a resident, the latter must be notified in writing of the charges which gave rise to the consideration, that a meeting will be held, giving the time, date and place of the meeting, the fact that at the meeting the resident may present written statements to the committee and may ask questions of people present at the meeting; that he may be represented by a willing lay person, as provided in WAC 275-82-020; that he has a right to remain silent if he is alleged to have engaged in criminal activity, and that anything he says may be used against him in a criminal proceeding. This notice must be provided not less than 24 hours before the meeting.

The section provides for emergency placement in segregation, followed by a "meeting" not more than 3 days later. Further postponements are governed by the rules.

Under WAC 275-82-025, the resident is to be present at all stages of the meeting, except the consideration of the decision and during discussions involving anonymous sources. The resident may record the meeting, using his own recording equipment. A record of the proceedings shall also be recorded, clearly indicating what information was presented. Information from anonymous sources is permitted but it must be reduced to writing and the information shared with the resident, so long as such revelation does not endanger the source. The veracity of such anonymous information must be attested by an official above the rank of captain, and the identity of the source revealed to the committee.

Under WAC 275-82-030, the committee's decision must be based on the information presented at the meeting. The resident may appeal to the superintendent or his designee, who is directed to act on the appeal within 3 working days

and to provide the resident with written reasons for his decision. If the superintendent reverses a decision not to segregate the resident, he must give a written justification of his decision to reverse. WAC 275–82–040. Under WAC 275–82–045, there must be periodic reviews of administrative segregation, at which meetings the resident is entitled to be present and to participate according to the rules for the initial meeting.

The final provision of this chapter is significant here. It reads:

> If after a hearing the resident is transferred to another institution, the decision of the committee shall be considered valid by the receiving institution subject to a review of his status as provided in WAC 275–82–045(1).

WAC 275–82–050. These regulations contemplate that a transfer may follow administrative segregation, as occurred here. The apparent reason for a transfer under these circumstances is to place the resident in an institution where he can safely be returned to the general prison population, rather than be kept for an extended period in segregation.

It will be seen that these rules afford the resident a hearing (termed a "meeting") which embodies many of the safeguards required for criminal due process. The omissions, such as the right to confront adverse witnesses, are ones which the courts have deemed justifiable in the prison setting, due to the disruption which some procedures are likely to foment. *See Wolff v. McDonnell*, 418 U.S. 539, 566–72, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). The procedures provided in these rules are sufficient to afford some assurance that decisions to segregate (which include as a possible further action a decision to transfer) will not be made arbitrarily, and they accord to the prisoner that measure of human respect and dignity which is deemed essential for the successful reformation and rehabilitation of persons confined in penal institutions. We assume that these rules were promulgated with those objectives in mind, in accordance with the legislative directive to pursue the goals of rehabilitation and reformation. All that remains to

be done is to abide by the rules.

Had the petitioner here been given the hearing which is required by these rules prior to his administrative segregation, he would have been apprised of the allegations regarding his conduct which inspired that decision, and would have had an opportunity to refute them. He would have been given the written reasons for the committee's decision. His appeal, had he taken one, would have been considered, and written reasons for the decision would have been placed in his hands. It is evident from the records that the same reasons which supported the segregation afforded the basis for the transfer of the petitioner. The rules themselves contemplate that this will be the case wherever a prisoner is transferred after having been segregated. Thus, had the rules been followed, the remedy which the petitioner seeks would have been afforded him.

It is ordered that a hearing, according to the procedures prescribed in the Washington Administrative Code, shall promptly be granted to the petitioner, except that the time limitations which can no longer be met will not be required in this instance.

STAFFORD, BRACHTENBACH, DOLLIVER, and HICKS, JJ., and COCHRAN, J. Pro Tem., concur.

UTTER, C.J. (concurring)—Petitioner's transfer is void for several reasons besides those given by the majority.

The state is authorized to transfer a prisoner to an out–of–state institution only when

> the duly constituted judicial or administrative authorities [in this state] shall decide that confinement in, or transfer . . . to, an institution within the territory of another party state is necessary in order to provide adequate quarters and care or desirable in order to provide an appropriate program of rehabilitation or treatment . . .

RCW 72.70.010, art. 4(a). The provision requires, as a condition for an out–of–state transfer, that the prisoner needs

facilities or programs not available in this state.[6]

In this case, petitioner was transferred because he was a "negative leadership influence on the population and a threat to the security of the institution." He was not transferred because the State lacked the ability to care for him. Therefore, since petitioner was transferred for reasons other than those provided in RCW 72.70.010, his transfer is void.

Petitioner's transfer is also void for another reason. He has a due process right, protected by the Fourteenth Amendment,[7] to a hearing prior to any out–of–state transfer. Dicta in the majority would seem to indicate otherwise, but it fails to consider *Vitek v. Jones,* 445 U.S. 480, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980), the most recent case applying the due process test to prisoner transfers.

In *Vitek,* the United States Supreme Court held that Nebraska prisoners have a due process right to a hearing before being transferred to mental hospitals within that state. While *Vitek* did not involve interstate transfers,[8] it does set forth the standard by which to judge when due process mandates a pretransfer hearing. *Vitek* states that a hearing is constitutionally required when either (1) there is a state statute creating an expectation that there will be no transfers without cause, or (2) the transfer effects such a major change in the conditions of confinement as to constitute a "grievous loss". *Vitek,* at 488. Besides clarifying the due process analysis, *Vitek* has significance because it indi-

---

[6]The federal statute authorizing transfers from state to federal prisons has similarly been construed. *Compare Lono v. Fenton,* 581 F.2d 645 (7th Cir. 1978), *with Sisbarro v. Warden,* 592 F.2d 1 (1st Cir. 1979), *cert. denied,* 444 U.S. 849, 62 L. Ed. 2d 64, 100 S. Ct. 99 (1979).

[7]Several state courts have relied on their state constitutions to find the right to pretransfer hearings. *See, e.g., People v. Ramirez,* 25 Cal. 3d 260, 599 P.2d 622, 158 Cal. Rptr. 316 (1979); *Watson v. Whyte,* ___ W. Va. ___, 245 S.E.2d 916 (1978).

[8]Interstate transfers also were not involved in *Meachum v. Fano,* 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976) and *Montanye v. Haymes,* 427 U.S. 236, 49 L. Ed. 2d 466, 96 S. Ct. 2543 (1976), the cases relied upon by the majority.

cates that *Meachum v. Fano,* 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976) and *Montanye v. Haymes,* 427 U.S. 236, 49 L. Ed. 2d 466, 96 S. Ct. 2543 (1976), did not signal the demise of the "grievous loss" prong of the due process test, as thought by several lower federal courts, *see, e.g., Sisbarro v. Warden,* 592 F.2d 1 (1st Cir. 1979); *Walker v. Hughes,* 558 F.2d 1247 (6th Cir. 1977), and the majority.

The "grievous loss" test, announced by *Vitek,* focuses on the qualitative rather than the quantitative consequences of any transfer. *Vitek,* at 493. The focus is on the nature of the interest affected, not the degree of change. The cases relied upon by the majority did not employ this test. *See, e.g., Sisbarro v. Warden, supra; Cofone v. Manson,* 594 F.2d 934 (2d Cir. 1979).

The qualitative deprivations attending an out–of–state transfer include: separation from family and friends; inability to see in person the Board of Prison Terms and Paroles, which will determine the prisoner's release date; inability to have in–state counselors who know the parole board and can best present the prisoner's case and pursue generally the possibility of parole; loss of adequate access to local courts and counsel, and especially to Washington legal materials; loss of access to the state political system which remains in legal custody of the prisoner. *See generally Ali v. Gibson,* 483 F. Supp. 1102, 1121–24 (D.V.I. 1979); Mille-mann & Millemann, *The Prisoner's Right to Stay Where He Is: State and Federal Transfer Compacts Run Afoul of Constitutional Due Process,* 3 Cap. U.L. Rev. 223, 229–34 (1974). As stated in *Hoitt v. Vitek,* 361 F. Supp. 1238, 1251–52 (D.N.H.), *aff'd sub nom. Laaman v. Vitek,* 502 F.2d 1158 (1st Cir. 1973):

> The evidence also shows that transfer radically transforms an inmate's life. Involuntary out–of–state transfer subjects an inmate to several severe deprivations. He is effectively cut off from his family and friends. His work, job training, and educational and rehabilitative programs are interrupted. Transfer seriously burdens an inmate's access to counsel and the courts and impairs his parole chances. Psychiatric and medical treatment may be tem-

porarily curtailed. A transferee is generally branded a troublemaker and treated as such without being given an opportunity to defend himself and refute such a "reputation." Furthermore, the psychological effect of involuntary interstate transfer is damaging to the inmate and impede[s] any effort to rehabilitate him. In no case is there evidence that transfer enhanced an inmate's prospects of rehabilitation.

While a prisoner does not have a vested right to remain in the institution to which he was originally committed, this is not dispositive of the constitutional issue presented. The determination of whether due process requirements apply depends upon a determination of the nature of the interests being infringed, not upon a weighing of the competing interests of the parties. Board of Regents v. Roth, 408 U.S. 564, 570–571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is evident that involuntary interstate transfers have a punitive effect on the transferred inmates and involve an ·infringement of liberty and, to some extent, a loss of property.

*Accord, Ali v. Gibson, supra; Croom v. Manson,* 367 F. Supp. 586 (D. Conn. 1973). This analysis, while arguably inconsistent with *Meachum* and *Montanye,* comports with *Vitek.* It shows that an out–of–state confinement is "qualitatively different from the punishment characteristically suffered by a person convicted of a crime" in Washington. *See Vitek,* at 493. Consequently, transfers out of Washington do constitute the "grievous loss" envisioned by *Vitek,* and thus necessitate a pretransfer hearing.

Furthermore, even if interstate transfers do not impose a "grievous loss," RCW 72.70.010, art. 4(a) creates a liberty interest entitled to due process protection.[9] Both *Meachum*

---

[9]Arguably, RCW 72.68.010 also creates a protected expectation. It reads:

"Whenever in its judgment the best interests of the state or the welfare of any prisoner confined in any penal institution will be better served by his transfer to another institution the secretary may effect such transfer." *But see Cofone v. Manson, supra* at 938, holding that a similarly worded Connecticut statute provides no protected right.

WAC 275–88 likewise potentially creates a legally recognized expectation. It provides for hearings prior to any transfer based on the prisoner's misconduct. *See* WAC 275–88–050, –055, –100, and –105(2)(g). A prisoner could justifiably infer from those provisions that a hearing would be held prior to all transfers.

and *Vitek* require due process hearings when the state creates either a right or justifiable expectation that the prisoner will not be transferred except for misbehavior or upon the occurrence of other specified events. *See Vitek,* at 488–89.

RCW 72.70.010, art. 4(a) provides that prisoners may be transferred out of state only when

> confinement in, or transfer of an inmate to, an institution within the territory of another party state is necessary in order to provide adequate quarters and care or desirable in order to provide an appropriate program of rehabilitation or treatment . . .

This provision creates an expectation that prisoners will not be transferred out of state unless they need facilities or programs not available in Washington. Such an expectation is sufficient to invoke procedural protections. *See Vitek v. Jones, supra; Meachum v. Fano, supra.* Thus, on the basis of either RCW 72.70.010 or the "grievous loss" inflicted on petitioner by his interstate transfer, he was denied due process when transferred without a hearing.

To conclude that petitioner has no right to a hearing would also be a denial of equal protection. WAC 275–88 explicitly requires a hearing when a proposed transfer is based upon the prisoner's alleged misconduct. *See* WAC 275–88–050, –055, –100, and –105(2)(g). No one has suggested a rational basis for denying petitioner a pretransfer hearing while conferring one to a prisoner who has committed an infraction. Therefore, such disparate treatment violates equal protection. *See Harmon v. McNutt,* 91 Wn.2d 126, 587 P.2d 537 (1978). Consequently, for this reason as

well as those already noted, petitioner's transfer is void.

HOROWITZ, J., concurs with UTTER, C.J.

Reconsideration denied April 23, 1981.