12 P.3d 585 (2000)
142 Wash.2d 298
In Matter of the Personal Restraint of Michael MATTESON, Russell Taylor, and Jason Hull, Petitioners.
Nos. 68310-7, 68486-3, 68492-8.
Supreme Court of Washington, En Banc.
Argued May 9, 2000.
Decided November 2, 2000.
*586 Russell D. Taylor, Jason Edward Hull, Airway Heights, Michael Matteson, Monroe, Pro se.
Suzanne Elliott, Seattle, for Petitioners.
Christine Gregoire, Atty. Gen., John Scott Blonien, Kasey Kneip, Martin E. Wyckoff, Asst. Attys. Gen., Olympia, for Respondent.
Kevin Christian Osborn, Seattle, Amicus Curiae on behalf of American Civil Liberties Union.
BRIDGE, J.
In 1999, the Washington Department of Corrections (DOC) transferred 254 inmates to the private Crowley County Correctional Facility (Crowley) in Olney Springs, Colorado. Many of those inmates have filed, pro se, personal restraint petitions with this court contesting the legality of their transfer. Review has been granted, and counsel appointed, for three representative petitions from Jason Hull, Michael Matteson, and Russell Taylor. Together petitioners argue that the Legislature improperly granted the DOC the authority to transfer them to Crowley. In the alternative, they argue that due process required a pretransfer hearing. They contend that the DOC has surrendered jurisdiction over them as a result of their transfer and seek release from incarceration for the remainder of their sentences. For reasons set forth herein, we deny the personal restraint petitions and hold that the DOC possessed the proper statutory authority to transfer the petitioners to Crowley, and further hold that this transfer did not violate due process.

FACTS
Because these personal restraint petitions (PRPs) were originally before us pro se, the record is very limited. "Legal face sheet[s]" attached as exhibits to the DOC's response briefs reveal in scant detail the petitioners' crimes and sentences. Hull was convicted of second degree murder in Clark County Superior Court and is serving a sentence of over 23 years. Matteson was convicted in King County Superior Court of child molestation and is serving a sentence of over 10 years. Taylor was convicted of second degree murder in Thurston County Superior Court and is serving a sentence of over 18 years.
In November 1998, the DOC signed a "Memorandum of Understanding" with the Teamsters' union that represents guards in its correctional facilities. That memorandum spoke of "an immediate need to address the offender overcrowding situation until such time as beds come on line at Stafford Creek Corrections Center."[1] It was agreed that placement of offenders outside of DOC facilities would be "an interim measure only" and that "[a]t such time as beds become available within the Department, all offenders will be returned to facilities operated by the Washington State Department of Corrections."[2] *587 On February 26, 1999, the DOC entered into a contract with the Colorado Department of Corrections and Crowley Correctional Services L.L.C. to house transferred Washington inmates.
In early March 1999, Hull, Matteson, and Taylor were among 254 inmates transferred from Washington correctional facilities to the private Crowley facility. Each inmate was granted the opportunity to appeal his transfer.[3] According to an affidavit from Eldon Vail, the deputy secretary of DOC, the reason for this transfer was that the DOC was "experiencing an excess of inmates over bed space. The overcapacity problem is expected to continue until early 2000, when it is anticipated that the Stafford Creek facility in Grays Harbor will be completed and available."[4] Vail stated that "overcrowding in a prison setting can be very dangerous" and "ordinary methods" of easing it could not have relieved the necessity of transferring the inmates temporarily to Crowley.[5] He averred that not only would the construction of temporary bed space have taken too long, but other state facilities did "not have sufficient capacity to accept any substantial number of DOC inmates."[6]
Upon being transferred to Colorado, the Washington inmates filed an array of PRPsgenerally arguing that their transfer to Colorado was illegal. In August and September 1999, Hull, Matteson, and Taylor each filed, pro se, the underlying PRPs at issue here. We granted review and consolidated the three PRPs. In his October 29, 1999, order granting review, Chief Justice Guy also directed that counsel be appointed to represent the three petitioners. The American Civil Liberties Union was granted leave to file an amicus curiae brief.
Prior to review being granted, Hull had originally requested preliminary relief preventing his transfer back to Washington, and Chief Justice Guy denied this in his order. Undeterred, all three petitioners joined forces in a second pro se motion for a preliminary injunction to prevent Crowley's warden from transferring them from the facility prior to the resolution of their PRPs. The clerk advised the petitioners that this motion should be filed through their counsel of record, and counsel advised him that she had no objection to the filing. The clerk then denied the motion, noting that Chief Justice Guy had already denied the same motion in Hull's case. Counsel made a motion to modify this ruling, and that motion was denied on May 2, 2000. All Washington inmates had been returned to state facilities as of June 28, 2000, and the DOC's contract with Crowley expired two days later.

ANALYSIS

I.
At the threshold, we must resolve a motion by the State to dismiss this matter as moot in light of the fact that, following oral argument, all three petitioners were returned to Washington. We decline the State's motion to declare this matter moot for that reason, as it ignores the nature of petitioners' argument. Petitioners were not seeking to return to Washington. Instead they claim that the State surrendered jurisdiction over them as a result of their allegedly unlawful transfer to Crowley. In light of petitioners' argument, their transfer back to Washington would only compound their injury (through continued incarceration), not remedy it. While we do not accept this argument, we will resolve the issues petitioners raise.
In a PRP, it is not enough for petitioners to demonstrate constitutional error. They must meet the "threshold burden of demonstrating actual and substantial prejudice" arising from that error.[7] The error must be "significant enough to justify overriding principles of finality."[8] This is true because "`collateral relief undermines the principles of finality of litigation, degrades *588 the prominence of the trial, and sometimes costs society the right to punish admitted offenders.'"[9]
The petitioners argue that their restraint is unlawful because "[t]he conditions or manner of ... restraint ... are in violation of the Constitution of the United States or the Constitution or laws of the State of Washington...." RAP 16.4(c)(6). The petitioners contend that the Legislature had not properly granted the DOC the authority to transfer inmates to a private, out-of-state correctional facility, and that, accordingly, the DOC has surrendered jurisdiction over them and they should be released from confinement and from the balance of their sentences. The DOC counters by arguing that it did possess properly granted authority to transfer the inmates to Crowley.
In granting review, we directed that the parties specifically address whether the Legislature properly amended RCW 72.09.050 in the 1999 bill adopting a state budget. That bill, Engrossed Substitute Senate Bill 5180, was entitled, "An Act Relating to fiscal matters...."[10] This is a pivotal issue inasmuch as the petitioners argue that the only authority for their transfer was derived from changes to RCW 72.09.050. In relevant part, RCW 72.09.050, with the 1999 changes underlined, reads as follows:
The secretary shall manage the department of corrections and shall be responsible for the administration of adult correctional programs, including but not limited to the operation of all state correctional institutions or facilities used for the confinement of convicted felons. In addition, the secretary shall have broad powers to enter into agreements with any federal agency, or any other state, or any Washington state agency or local government providing for the operation of any correctional facility or program for persons convicted of felonies or misdemeanors or for juvenile offenders. Such agreements for counties with local law and justice councils shall be required in the local law and justice plan pursuant to RCW 72.09.300. The agreements may provide for joint operation or operation by the department of corrections, alone, or by any of the other governmental entities, alone. Beginning February 1, 1999, the secretary may expend funds appropriated for the 1997-1999 biennium to enter into agreements with any local government or private organization in any other state, providing for the operation of any correctional facility or program for persons convicted of felonies. Between July 1, 1999, and June 30, 2001, the secretary may expend funds appropriated for the 1999-01 biennium to enter into agreements with any local government or private organization in any other state, providing for the operation of any correctional facility or program for persons convicted of felonies.
The question is whether the 1999 changes were a grant of authority, in violation of Const. art. II, § 19, to the DOC to transfer inmates to a private facility like Crowley. The DOC correctly points out that its contract to house the Washington inmates was initially with both the State of Colorado and Crowley Correctional Services L.L.C. However, RCW 72.09.050, without the language added in 1999, stated that the agreements it authorizes "may provide for joint operation or operation by the department of corrections, alone, or by any of the other governmental entities, alone." There is no dispute over the fact that neither the DOC nor the State of Colorado operates the private Crowley facility, either jointly or alone. RCW 72.09.050's pre-1999 language could be read as limiting the DOC's authority to transfer inmates to such a facility.
The DOC, pointing to another statute, argues that its authority for transferring inmates to a private, out-of-state facility predated 1999. In relevant part, RCW 72.68.010, under the apt heading "Transfer of prisoners" (emphasis added), reads as follows: "Whenever in its [sic] judgment the best interests of the state or the welfare of any prisoner confined in any penal institution will be betterserved by his or her transfer to *589 another institution or to a foreign country..., the secretary may effect such transfer consistent with applicable federal laws and treaties." Obviously this language places no express limitation upon the DOC secretary's authority to transfer inmates to a facility like Crowley.
We presume that a statute is constitutional and those "`challenging its constitutionality must demonstrate its unconstitutionality beyond a reasonable doubt. This standard is met if argument and research establish that there is no reasonable doubt the statute violates the Constitution.'"[11] Const. art. II, § 19, provides that, "No bill shall embrace more than one subject, and that shall be expressed in the title." Of the relationship between Const. art. II, § 19, and appropriations acts, we have written, "[I]f legislation of a general and continuing nature is to be passed, it cannot come under the subject of appropriations...."[12]
We recently noted that "a budget bill, by its nature, appropriates funds for a finite time periodtwo yearswhile substantive law establishes public policy on a more durable basis."[13] Because RCW 72.09.050 was amended through an appropriations act, petitioners argue that the appropriations act's scope was exceeded by enacting substantive law. We need not reach that argument, however, for it has been rendered moot. We are persuaded that any ambiguity concerning whether the DOC's authority to transfer these inmates was embodied in former RCW 72.68.010 (1983), and predated the 1999 changes to RCW 72.09.050, has been clarified by a recent act of the Legislature.
The same Fifty-Sixth Legislature that adopted the changes to RCW 72.09.050 in 1999, unanimously passed, after briefs were filed in this case, "clarifying" changes to RCW 72.68 during the 2000 regular legislative session. Engrossed Substitute Senate Bill (ESSB) 6761 was introduced at the DOC's request and entitled, "An Act Relating to agreements for the operation of correctional facilities and programs in any other state."[14] A new section to RCW 72.68 was added that reads as follows:
The legislature has in the past allowed funding for transfer of convicted felons to a private institution in another state. It is the legislature's intent to clarify the law to reflect that the secretary of corrections has authority to contract with private corporations to house felons out-of-state and has had that authority since before February 1, 1999, when specific authority to expend funds during specified bienniums was granted under RCW 72.09.050. The secretary has the authority to expend funds between February 1, 1999, and June 30, 2001, for contracts with private corporations to house felons out-of-state.[15]
Clarifying changes were made to RCW 72.68.010 and RCW 72.68.040, and standards were provided within RCW 72.68.010 for determining when transfer might pose a hardship to an inmate.[16] Two other new sections were added to RCW 72.68; one requiring the notifying of victims prior to an inmate's out-of-state transfer into a facility near where the victim of the inmate resides, and the other declaring an emergency.[17]
"`Wherever possible, it is the duty of this court to construe a statute so as to uphold its constitutionality.'"[18] Of curative legislation, *590 we have written, "[S]ubsequent enactments that only clarify an earlier statute can be applied retrospectively."[19] Indeed, "[i]t is not necessary that a statute expressly state that it is intended to operate retrospectively if such an intention can be obtained by viewing its purpose and the method of its enactment."[20] We have previously found legislation to have retroactive, curative effect when "it clarifies or technically corrects an ambiguous statute."[21]
The scope of the power of the DOC secretary to transfer inmates, under RCW 72.68.010, to a private, out-of-state correctional facility, was arguably ambiguous prior to the enactment of ESSB 6761 during the pendency of this case. We have written that, "When an amendment clarifies existing law and where that amendment does not contravene previous constructions of the law, the amendment may be deemed curative, remedial, and retroactive. This is particularly so where an amendment is enacted during a controversy regarding the meaning of the law."[22] This is obviously such ah instance. We have stated that "[c]ourts are not at liberty to speculate on legislative intent when the legislature itself has subsequently placed its own construction on prior enactments."[23] We can also turn to a leading treatise for its definition of curative legislation:
A curative act is a statute passed to cure defects in prior law, or to validate legal proceedings, instruments, or acts of public and private administrative authorities. In the absence of such an act the statute would be void for want of conformity with existing legal requirements.
Except as it may invade some substantive interest which enjoys specific constitutional protection, a curative act may validate any past action which the legislature might have authorized beforehand....
Generally, curative acts are made necessary by inadvertence or error in the original enactment of a statute or in its administration. Action under the statute is usually taken in good faith and no rights are jeopardized by the validation of the prior good faith action. Because of the positive policy thus served by curative legislation, to sustain the reliability of official actions and secure expectations formed in reliance thereon, they are entitled to liberal construction in order to achieve full fruition of their remedial purposes.[24]
Counsel for petitioners conceded during oral argument that a curative act is applied retroactively but argued, quite implausibly, that ESSB 6761 was not intended to be curative.[25] We disagree. In light of the foregoing, we find any ambiguity concerning the DOC's power under RCW 72.68.010 to transfer inmates to a private, out-of-state, facility like Crowley to have been cured by enactment of ESSB 6761. Nor would any *591 judicial construction be contravened by the retrospective application of this new act to clarify the scope of RCW 72.68.010.[26]

II.
With the central question in this case answered, the remaining issue, presented in the alternative, is quickly resolved. Petitioners also invoke the factors set forth in State v. Gunwall,[27] in an attempt to argue that their due process rights under Const. art. I, § 3 are greater than such rights under the fifth and fourteenth amendments to the United States Constitution. They contend that Const. art. I, § 3 entitled them to notice and a hearing prior to their transfer to the Crowley facility, and that release from confinement is also the remedy for a failure to hold a pre-transfer hearing. Petitioners must concede that there is no such entitlement under the United States Constitution.[28]
In Gunwall,[29] we identified six nonexclusive criteria that must be addressed before we will interpret a provision of the state constitution independent of its parallel clause in the federal constitution: (1) the state provision's textual language; (2) significant differences between the federal and state texts; (3) state constitutional and common law history; (4) preexisting state law; (5) structural differences between the federal and state constitutions; and (6) matters of particular state interest or local concern.
The textual language of Const. art. I, § 3 reads as follows: "No person shall be deprived of life, liberty, or property without due process of law." As we have noted previously, "No further elaboration is provided."[30] Moreover, there are no material differences between the "nearly identical" federal and state provisions.[31] This disposes of the first two Gunwall factors. As for the third Gunwall factor, "no legislative history has been shown which would provide a justification for interpreting the identical provisions differently."[32] While analysis of the fifth Gunwall factor "may support the notion that our constitution is more protective in a general sense[,]" we have found that with respect to Const. art. I, § 3 it "does not shed any light on this particular issue."[33] Nor does petitioners' argument here illuminate matters.
Effectively conceding that there is no material difference between the state and federal due process clauses, petitioners also invoke Const. art. I, § 14, the state constitution's prohibition against cruel and unusual punishment, as support for the proposition that their transfer was tantamount to "banishment."[34] They cite State v. Gitchel,[35] which is a patently inapposite case. There, as a condition of suspending a 10-year maximum sentence for the crime of felony escape, the trial court had imposed upon the defendant a one year term in solitary confinement *592 and, upon release, banishment "forever" from the state of Washington.[36] The Court of Appeals, quite properly, wrote that it could "unhesitantly say that a sentence with such condition of suspension would constitute cruel and unusual punishment in violation of the eighth amendment to the United States Constitution, as well as article 1, section 14 of the Washington State Constitution."[37] Thus, it was clear that the court was not even independently interpreting Const. art. I, § 14,[38] quite apart from the distinction that the facts before it were wholly dissimilar to those presented here. Gitchel does not advance petitioners' arguments. As the Court of Appeals has noted elsewhere: "The constitutional impediments to types of punishment are limited to cruel or unusual punishmentnot harsh punishment U.S. Const. amend. 8; Const. Art. 1, § 14. All punishment by confinement in a penitentiary is harsh in the sense that it is strongly unpleasant to the person upon whom it is inflicted."[39]
Petitioners also refer us to In re Personal Restraint of Young.[40] However, Young does not support their position. Young involved a Washington inmate who, after having been placed in administrative segregation for disciplinary reasons, was transferred from a state facility to a federal penitentiary, and ultimately transferred to state facilities in Tennessee and Arizona.[41] In a PRP he argued that he had a right to be incarcerated in Washington, or at least to be granted a hearing prior to being transferred, and that his constitutional right of access to the courts was violated by the transfers.[42] We noted that "persons convicted of felonies are not sentenced to a particular institution[,]" and "it appears that the laws of this state afford a prisoner no reasonable expectation that he will be confined in the state penitentiary so long as he obeys the rules."[43] We further noted that
[a]n interstate transfer may involve a greater loss, simply because of the greater distance from home (assuming the prisoner's home was situated near the first prison, as is the case here). Nevertheless, unless he has some reasonable expectation grounded in state law that he will not be transferred except upon a finding of certain facts, he does not have a liberty interest in remaining at his place of incarceration under the Fourteenth Amendment's due process clause.[44]
However, in Young it was not necessary to assess whether Const. art. I, § 3, quite unlike the Fourteenth Amendment, required a pretransfer hearing.[45] This was because we found that administrative rules requiring a hearing prior to the administrative segregation, so that the inmate might know and be able to refute allegations concerning his conduct, had not been followed. The initial transfer was predicated upon the segregation.[46] *593 Thus, we simply ordered a hearing in accordance with the rules for the petitioner.[47] We did not order him freed.
Here, quite unlike the facts in Gitchel or Young, the petitioners' temporary transfer to Colorado was not a condition of punishment nor the result of discipline. The DOC is correct that Young cannot be understood to require a pretransfer hearing here, where a rule does not require it and the out-of-state transfers were not made for sentencing or disciplinary reasons where arbitrariness would be a concern. The DOC notes that the petitioners here did, however, have a right of appeal of transfer decisions, and that various criteria went into making those decisions. Similar to Young, here the DOC's own policy affords a remedy. No argument is made that these three petitioners did not have the opportunity to appeal their transfers.
Under these circumstances, we can rely upon federal constitutional law. We find persuasive the United States Supreme Court's resolution of a similar caseone involving an inmate transferred from a state prison in Hawaii to one in California.[48] There, the Court wrote, "Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State."[49] In language directly relevant here, the Court noted that "[o]vercrowding ... may necessitate interstate transfers. For any number of reasons, a State may lack prison facilities capable of providing appropriate correctional programs for all offenders."[50] Moreover, the Court wrote, "Even when, as here, the transfer involves long distances and an ocean crossing, the confinement remains within constitutional limits."[51] Finally, the Court specifically rejected a banishment argument much like the one petitioners here advance, writing, "[R]espondent in no sense has been banished; his conviction, not the transfer, deprived him of his right to freely inhabit the State. The fact that his confinement takes place outside Hawaii is merely a fortuitous consequence of the fact that he must be confined, not an additional element of his punishment."[52] In short, as the United States Seventh Circuit Court of Appeals recently observed, in passing upon the constitutionality of a Wisconsin statute allowing Wisconsin authorities to contract with private, out-of-state prisons: "A prisoner has a legally protected interest in the conduct of his keeper, but not in the keeper's identity."[53]
In sum, notwithstanding the petitioners' policy arguments against private prisons and prison transfers generally, arguments that would be better addressed to the Legislature,[54] the law is that prisoners do not have a right to be housed in a certain prison or even a certain state. We reaffirm that "persons convicted of felonies are not sentenced to a particular institution...."[55] Petitioners do not make a persuasive case for an independent application of Const. art. I, § 3 to require a pretransfer hearing.

CONCLUSION
The DOC was operating under a proper grant of authority from the Legislature when *594 it transferred Washington inmates to a private, out-of-state correctional facility. There was no requirement, under either the state or federal constitutions, that the DOC provide hearings for inmates prior to their being transferred. The personal restraint petitions Kare denied.
GUY, C.J., SMITH, MADSEN, TALMADGE, and IRELAND, JJ., concur.
ALEXANDER, J. (concurring).
Although, I have substantial doubts about whether the Department of Corrections had the legal authority to transfer the petitioners to a private prison in Colorado without, at the very least, providing them with a pre-transfer hearing, I nevertheless concur in the decision to deny their personal restraint petitions. I do so because the case is moot. I reach that conclusion because the petitioners and all other Washington inmates have now been returned to Washington, state institutions. Because I am of the view that the maximum relief that Hull, Matteson, and Taylor would have been entitled to receive, had we concluded their transfer was illegal, was to be returned to this state, we can afford them no relief. Little is served, therefore, by legal jousting about the legality of a transfer that has now been undone and appears unlikely to be repeated.
JOHNSON, and SANDERS, JJ., concur.
NOTES
[1] Suppl. Reply Br., Ex. 1.
[2] Id.
[3] See Suppl. Reply Br., Ex. 2.
[4] Resp. of the DOC, Ex. 2, at 2, No. 68310-7.
[5] Id. at 3.
[6] Id.
[7] In re Personal Restraint of Cook, 114 Wash.2d 802, 810, 792 P.2d 506 (1990) (emphasis added).
[8] Id. at 811, 792 P.2d 506.
[9] Id. at 809, 792 P.2d 506 (quoting In re Personal Restraint of Hews, 99 Wash.2d 80, 86, 660 P.2d 263 (1983)).
[10] Laws of 1999, ch. 309.
[11] State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 808, 982 P.2d 611 (1999) (emphasis added) (quoting Belas v. Kiga, 135 Wash.2d 913, 920, 959 P.2d 1037 (1998)).
[12] State ex rel. Wash. Toll Bridge Auth. v. Yelle, 54 Wash.2d 545, 551, 342 P.2d 588 (1959) (emphasis added).
[13] Wash. State Legislature v. State, 139 Wash.2d 129, 145, 985 P.2d 353 (1999).
[14] Laws of 2000, ch. 62, § 1.
[15] Id. at § 1 (emphasis added).
[16] These new standards, quite contrary to petitioners' characterization at oral argument, do not require a pretransfer hearing; the determination as to whether they support an inmate's transfer is reposed solely in the DOC secretary. See id.
[17] Laws of 2000, ch. 62, §§ 3,4.
[18] Addleman v. Board of Prison Terms, 107 Wash.2d 503, 510, 730 P.2d 1327 (1986) (quoting State v. Browet, Inc., 103 Wash.2d 215, 219, 691 P.2d 571 (1984)).
[19] State v. Dunaway, 109 Wash.2d 207, 216 n. 6, 743 P.2d 1237 (1987) (citing Johnson v. Morris, 87 Wash.2d 922, 925, 557 P.2d 1299 (1976); Marine Power & Equip. Co. v. Human Rights Comm'n Hearing Tribunal, 39 Wash.App. 609, 614, 694 P.2d 697 (1985)).
[20] Snow's Mobile Homes, Inc. v. Morgan, 80 Wash.2d 283, 291, 494 P.2d 216 (1972).
[21] In re F.D. Processing, Inc., 119 Wash.2d 452, 461, 832 P.2d 1303 (1992) (emphasis added) (citing State v. Jones, 110 Wash.2d 74, 82, 750 P.2d 620 (1988)).
[22] Tomtinson v. Clarke, 118 Wash.2d 498, 510-11, 825 P.2d 706 (1992) (footnotes omitted).
[23] Anderson v. City of Seattle, 78 Wash.2d 201, 203, 471 P.2d 87 (1970) (citing Carpenter v. Butler, 32 Wash.2d 371, 201 P.2d 704 (1949); Cowiche Growers, Inc. v. Bates, 10 Wash.2d 585, 117 P.2d 624 (1941); State ex rel. Oregon R.R. & Navigation Co. v. Clausen, 63 Wash. 535, 541, 116 P. 7 (1911)). Anderson found that a "1970 enactment constitutes a legislative construction of ... 1961 [statutory] amendments as to their effect upon pensions awarded prior to the effective date of those amendments." Id. at 204, 471 P.2d 87 (emphasis added).
[24] 2 NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 41.11 (5th ed.1993) (footnotes omitted).
[25] But see Laws of 2000, ch. 62, § 1 ("The legislature has in the past allowed funding for transfer of convicted felons to a private institution in another state. It is the legislature's intent to clarify the law to reflect that the secretary of corrections has authority to contract with private corporations to house felons out-of-state and has had that authority since before February 1, 1999....") (emphasis added). Surely a clearer expression of curative effect could hardly be found.
[26] See Stale v. Dunaway, 109 Wash.2d 207, 216 n. 6, 743 P.2d 1237 (1987) ("[E]ven a clarifying enactment cannot be applied retrospectively when it contravenes a construction placed on the original statute by the judiciary." (citations omitted)).
[27] 106 Wash.2d 54, 720 P.2d 808 (1986).
[28] See Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); Pischke v. Litscher, 178 F.3d 497 (7th Cir.), cert. denied, 528 U.S. 954, 120 S.Ct. 380, 145 L.Ed.2d 296 (1999).
[29] 106 Wash.2d at 61-62, 720 P.2d 808.
[30] State v. Ortiz, 119 Wash.2d 294, 302, 831 P.2d 1060 (1992).
[31] State v. Wittenbarger, 124 Wash.2d 467, 480, 880 P.2d 517 (1994); Ortiz, 119 Wash.2d at 303, 831 P.2d 1060. The Fifth Amendment provides, in relevant part: "No person shall ... be deprived of life, liberty, or property, without due process of law." The Fourteenth Amendment provides, in relevant part: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law...."
[32] Ortiz, 119 Wash.2d at 303, 831 P.2d 1060 (emphasis added) (citing JOURNAL OF THE WASHINGTION STATE CONSTITUTIONAL CONVENTION, 1889, at 495-96 (Beverly Paulik Rosenow ed.1962)).
[33] Id. (emphasis added).
[34] See Gunwall, 106 Wash.2d at 61, 720 P.2d 808 (Under the second Gunwall factor, "[e]ven where parallel provisions of the two constitutions do not have meaningful differences, other relevant provisions of the state constitution may require that the state constitution be interpreted differently.").
[35] 5 Wash.App. 93, 486 P.2d 328 (1971).
[36] Id. at 94, 486 P.2d 328.
[37] Id. at 95, 486 P.2d 328 (emphasis added).
[38] Furthermore, the court's declaration that the original sentence was cruel and unusual punishment was dicta, as the sentence had already been "modified to remove the unconstitutional penalties first levied." Id. at 96, 486 P.2d 328.
[39] State v. Rose, 7 Wash.App. 176, 183, 498 P.2d 897 (1972) (emphasis added).
[40] 95 Wash.2d 216, 622 P.2d 373 (1980).
[41] See id. at 217-18, 622 P.2d 373. Under the law then the secretary of the Department of Social and Health Services was vested with the authority to effect prison transfers. See id. at 228, 622 P.2d 373.
[42] See id. at 218, 622 P.2d 373.
[43] Id. at 228, 622 P.2d 373 (emphasis added).
[44] Young, 95 Wash.2d at 227-28, 622 P.2d 373. It is worth noting that this interpretation of the Fourteenth Amendment was prescient, predating as it did by three years the United States Supreme Court's own explicit approval of such inter state transfers. See Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813. Indeed, two justices in Young argued that the majority was incorrect in this interpretation of the Fourteenth Amendment. See Young, 95 Wash.2d at 233, 622 P.2d 373 (Utter, J., concurring). The Court had to that time only addressed the constitutionality of intra state prison transfers. See Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons." (emphasis added)).
[45] See Young, 95 Wash.2d at 229, 622 P.2d 373.
[46] Id. at 232, 622 P.2d 373.
[47] Id.
[48] Olim, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813.
[49] Id. at 245, 103 S.Ct. 1741 (emphasis added).
[50] Id. at 246, 103 S.Ct. 1741.
[51] Id. at 247, 103 S.Ct. 1741 (emphasis added).
[52] Id. at 248 n. 9, 103 S.Ct. 1741 (emphasis added) (citation omitted). The Court's reasoning effectively rebuts petitioners' argument that their temporary transfer to Colorado imposes an undue hardship upon relatives who might visit. Even in-state travel presents difficulty to those who might visit inmates. For example, traveling from the Olympic Peninsula to visit the Washington State Penitentiary at Walla Walla, or conversely traveling from Walla Walla to visit the Olympic Corrections Center in Forks, would hardly be convenient for an inmate's relatives.
[53] Pischke, 178 F.3d at 500 (emphasis added) (citing Olim, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813).
[54] Even amicus ACLU, while very conclusorily supporting petitioners' legal arguments with no analysis of its own, filed a brief primarily to urge us not to reach the issue of the constitutionality of private prisons as that issue is not before us.
[55] Young, 95 Wash.2d at 228, 622 P.2d 373.