[No. 47431–1.  En Banc.  December 10, 1981.]

JOHN W. RITTER, *Respondent,* v. THE BOARD OF COMMISSIONERS OF ADAMS COUNTY PUBLIC HOSPITAL DISTRICT NO. 1, *Appellant.*

504

Halverson, Applegate & McDonald, Inc., P.S., by *Dennis L. Fluegge* and *Bryan G. Evenson,* for appellant.

*Reed, Otterstrom & Giesa, P.S.,* by *D. Roger Reed* and *Michael J. Casey,* for respondent.

BRACHTENBACH, C.J.—Adams County Public Hospital District No. 1 (District) appeals from the Superior Court's reversal of the District Board of Commissioners' (Board) summary suspension of Dr. John Ritter's staff privileges at Ritzville Memorial Hospital (Hospital). Because the Board failed to follow its own rules in summarily dismissing Dr. Ritter, that act was improper. However, we hold that the review procedures followed after the summary action comported with due process and were otherwise sustainable. Therefore, the trial court erred in ordering Dr. Ritter's permanent reinstatement to the Hospital staff and the destruction of the hearing records.

The District is a state municipality which operates hospitals in Ritzville and Othello under authority of RCW 70.44. Its Board confers hospital "staff" or "courtesy staff" privileges upon selected physicians on an annual basis. Although no formal contract is entered, the Hospital maintains a "Medical Staff Appointment" sheet signed each year by a doctor's supervising medical and administrative personnel. Privileged physicians are entitled to admit patients and to perform medical procedures at district hospitals.

In 1970, Ritter moved to Ritzville from Seattle where he had practiced medicine for approximately 10 years. He was soon thereafter granted staff privileges at the Hospital, which were renewed in each of the next 7 years. During this period respondent enjoyed a good reputation with the public and a successful practice.

Friction began developing, however, between Ritter, the

nursing staff, and the then Hospital Administrator. Complaints were submitted to the staff executive committee about Ritter's repeated performance of surgery without a qualified assistant in violation of Hospital rules. Nurses were also concerned with his prescription of the drug Pitocin in excess of the suggested dosage. While committee members discussed these matters with Dr. Ritter, no formal action against him was taken.

On July 24, 1978, Ritter performed a tubal ligation under local anesthetic without a full surgical crew. Ritter decided that he did not need a full crew, although the Director of Nurses had informed him previously that the procedure was major surgery and required a qualified assistant. When the Director learned that Ritter was proceeding with only the assistance of his medex, she drove from Othello to Ritzville and assisted Ritter in the operation.

The Hospital Administrator learned of the tubal ligation incident the next day. He immediately ordered that no more operations be performed at the Hospital unless a full surgery crew was present. Ritter complied with this directive, performing six surgical procedures without any reported problems during the 3 weeks that followed.

The Administrator reported the tubal ligation incident to the Hospital Board by mail prior to their August 17 meeting. At the gathering he also informed the Board of other charges against Ritter including chart alterations, chart delinquencies, failure to cooperate with administration and staff, and violation of Hospital rules and regulations regarding the use of an unauthorized first assistant in surgery. The Board discussed its possible courses of action, then voted to summarily suspend Ritter's clinical privileges. The Board was authorized to do so by article 7, section 2 of the Medical Staff Bylaws, which reads, in part:

> [T]he governing body shall have the authority, whenever action must be taken immediately in the best interest of patient care in the hospital, to summarily suspend all or any portion of the clinical privileges of a practitioner, and such summary suspension shall become effective

immediately upon imposition.

Ritter was notified of the Board's action and decision by a notice of suspension dated August 22.

Ritter requested and was granted a hearing pursuant to the fair hearing plan which governed the procedure for suspending staff privileges. The hearing committee recommended that the tubal ligation surgery and one altered chart were grounds for immediate suspension. The Board accepted the recommendation and continued the suspension. Ritter then exercised his right of review before the Appellate Review Body (ARB). At the hearing before the ARB, Ritter challenged the participation of a Dr. Bunch on that panel because of his alleged pecuniary interest and because Bunch had been a witness before the hearing committee and therefore would be biased. The ARB, including Bunch, found that the suspension was justified. The Board then again voted to continue the suspension.

Ritter filed a writ of review, pursuant to RCW 7.16.120 before the Superior Court for Spokane County. After a week's trial, the court held, *inter alia,* that (1) Ritter had been deprived of his constitutionally protected liberty and property interests by not being accorded a presuspension hearing, (2) Ritter had been denied due process before the ARB by reason of a violation of the appearance of fairness doctrine stemming from Bunch's dual role as witness before the hearing committee and as a member of the ARB, (3) the summary suspension of Ritter was arbitrary and capricious, and (4) Ritter was ordered reinstated to all clinical privileges and offices at the Hospital.

## I

It is well settled that an administrative body must follow its own rules and regulations when it conducts a proceeding which can deprive an individual of some benefit or entitlement. *See In re Young,* 95 Wn.2d 216, 229–32, 622 P.2d 373 (1980); *Smith v. Greene,* 86 Wn.2d 363, 373–74, 545 P.2d 550 (1976); *Vitarelli v. Seaton,* 359 U.S. 535, 3 L. Ed. 2d 1012, 79 S. Ct. 968 (1959). The District's bylaws

provided for suspension of a physician's clinical appointment without a prior hearing only when "action must be taken immediately in the best interests of patient care". Art. 7, § 2, Medical Staff Bylaws. The trial court found that the Board initially solicited no medical staff advice as to whether Ritter's continued practice posed an imminent threat to patient care at the Hospital. Finding of fact No. 22. The court also found that none of the Board members concluded that there was an emergency meriting the immediate suspension of Dr. Ritter on August 17, 1978. Findings of fact Nos. 28, 29. The Board's stated rationale for the suspension was his "continued behavioral problems affecting risk management and for lack of cooperation with procedures" rather than for concerns that immediate suspension was in the best interest of patient care at Ritzville Hospital. Findings of fact Nos. 31, 32, 34, 35. Because the Board's suspension of Dr. Ritter prior to his hearing contravened the District's standards upon which all physicians were entitled to rely, its August 17 summary act was improper.

## II

■ Dr. Ritter claims that the Board's summary and then continued suspension of his Hospital staff privileges has deprived him of due process of the law. However, "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill–advised personnel decisions." *Bishop v. Wood,* 426 U.S. 341, 350, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976). The protections of the Clause adhere only if the asserted individual interests are encompassed within the Amendment's protection of "life, liberty or property." *Paul v. Davis,* 424 U.S. 693, 712, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976). If protected interests are implicated, we then must decide if the procedures employed constituted "due process of law." *Morrissey v. Brewer,* 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). Following that analysis, we find that the Board's derogation of Dr. Ritter's reputation in the community affected a protected "liberty" interest, but that his postsuspension hear-

ing afforded him due process of law.

■ Dr. Ritter claims a property interest in continued staff privileges for the duration of his annual appointment. A due process property interest exists "if there are such rules or mutually explicit understandings that support [an individual's] claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann,* 408 U.S. 593, 601, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972); *see Board of Regents v. Roth,* 408 U.S. 564, 577–78, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); *Perry,* at 602 (no property interest unless there is a "legitimate claim of entitlement"). Respondent does not have a constitutional right to practice in a public hospital simply because he is a licensed physician. *Hayman v. Galveston,* 273 U.S. 414, 416–17, 71 L. Ed. 714, 47 S. Ct. 363 (1927); *cf. Rao v. Board of County Comm'rs,* 80 Wn.2d 695, 699, 497 P.2d 591, *cert. denied,* 409 U.S. 1017, 34 L. Ed. 2d 309, 93 S. Ct. 436 (1972). A property interest could rest on a contractual basis, however, either express or implied. *See Lynch v. United States,* 292 U.S. 571, 579, 78 L. Ed. 1434, 54 S. Ct. 840 (1934); *Roth,* at 577 ("clearly implied promise of continued employment" is a property interest). The trial court made a legal conclusion that respondent's 1–year staff appointment constituted an "implied contract," and thus a property interest. This legal conclusion is unsupported either by the trial court's findings of fact or any other part of the record. Neither has respondent shown that he received any representations of "tenure." He appears to have had no more than a subjective expectancy of continued Hospital privileges. *See Kyles v. Eastern Neb. Human Servs. Agency,* 632 F.2d 57, 60 (8th Cir. 1980) (no property interest where public employee did not show that any understandings of tenure were fostered by his employer); *Smith v. Greene, supra* at 367 ("subjective expectancy" of tenure not entitled to due process protection). Although Ritter could assume he would remain a member of the Hospital staff absent cause for dismissal, and he was protected by extensive procedural protections established by the medical staff bylaws, he did not have a

property interest in staff privileges at Ritzville Memorial Hospital. *Suckle v. Madison Gen. Hosp.*, 499 F.2d 1364, 1365–66 (7th Cir. 1974).

Dr. Ritter claims that his "liberty" interests were triggered by both (1) his preclusion from practice at the Ritzville Hospital and (2) the derogation of his good name and reputation in the community and among his peers. *See generally Giles v. Department of Social & Health Servs.*, 90 Wn.2d 457, 461, 583 P.2d 1213 (1978) ("liberty" interest implicated for employment discharge if [1] government imposes a stigma and thereby forecloses the employee's freedom to obtain other employment *or* [2] dismisses an employee on grounds that call into question his integrity, honor, or good name in the community); *Department of Health & Social Servs. v. State Personnel Bd.*, 84 Wis. 2d 675, 687, 267 N.W.2d 644 (1978).

In *Giles* we held that a constitutionally protected "liberty" interest based on foreclosure of employment opportunities was not implicated where a discharged state employee's license was not revoked and "he was not prohibited from working in his chosen field." *Giles,* at 461; *see State ex rel. Swartout v. Civil Serv. Comm'n,* 25 Wn. App. 174, 184, 605 P.2d 796, *review denied,* 93 Wn.2d 1021, *cert. denied,* 449 U.S. 992, 66 L. Ed. 2d 288, 101 S. Ct. 527 (1980) (state must take some *affirmative* action to foreclose employment opportunities). In the present case, Ritter's license was not revoked, nor was he otherwise "prohibited from working in his chosen field." It is undisputed that for a time Ritter continued to operate his clinic, albeit with substantially fewer patients, after his Hospital privileges were suspended. Ritter's employment opportunities were only diminished, not foreclosed, and under *Giles'* reasoning he was not deprived of a "liberty" interest.

However, the other prong of the "liberty" interest test was satisfied. Shortly after Ritter's summary suspension, the District issued a press release which implicitly questioned his diligence, and arguably his competence, as a physician. Several months later at a public Board meeting

one of the Board members stated that reinstating Ritter pending the administrative appeal of his summary suspension would be tantamount to rehiring an embezzler at a bank. Clearly these charges "might seriously damage [Ritter's] standing and associations in his community." *Roth,* at 573. Had the District remained silent and not attempted to justify its actions, no liberty interest would have been implicated. *Board of Curators v. Horowitz,* 435 U.S. 78, 83, 55 L. Ed. 2d 124, 98 S. Ct. 948 (1978) (dismissal without publication of reasons therefore does not implicate liberty interest); *Codd v. Velger,* 429 U.S. 624, 628, 51 L. Ed. 2d 92, 97 S. Ct. 882 (1977) (per curiam); *Bishop v. Wood,* 426 U.S. 341, 348–49, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976).

■ Although we conclude that Ritter's interest in preserving his reputation is protected by the Fourteenth Amendment, his due process rights were not violated by the *timing* of the suspension hearing. As the United States Supreme Court noted in *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976),

> the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Requiring hospitals to provide immediate hearings before removing physicians from active practice could be unduly burdensome. The risk of unjustified suspension is small when the Board has worked closely with the doctor over a period of years as in this case. While Ritter's protected "liberty" interest is not a matter of life or death, the interest of the Board in insuring competent, careful medical attention at all times might well be. It is also recognized that hearings after reputational "liberty" interest deprivations "provide the person an opportunity to clear his

name". *Roth,* at 573 n.12. Many cases indicate that a hearing for this purpose *after* an individual's suspension is all that is constitutionally required. *E.g., Arnett v. Kennedy,* 416 U.S. 134, 157–58, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974) (Rehnquist, J., plurality opinion); *Bishop,* at 352 (Brennan, J., dissenting); *cf. Christhilf v. Annapolis Emergency Hosp. Ass'n,* 496 F.2d 174, 180 (4th Cir. 1974) ("due process does not always require a hearing before a doctor's [hospital] privileges are suspended"). In this context we agree.

Ritter's due process rights were not violated by the participation of a hearing committee witness, Dr. Bunch, on ARB.

We have recognized that there are at least three types of bias which call for disqualification in quasi–judicial proceedings. "These are [1] prejudgment concerning issues of fact about parties in a particular case; [2] partiality evidencing a personal bias or personal prejudice signifying an attitude for or against a party as distinguished from issues of law or policy; and, [3] . . . an interest whereby one stands to gain or lose by a decision either way." (Footnote omitted.) *Buell v. Bremerton,* 80 Wn.2d 518, 524, 495 P.2d 1358 (1972); *See* 3 K. Davis, *Administrative Law* § 19.1, at 371 (2d ed. 1980). The trial court concluded that Bunch's participation constituted the first type of bias. It is necessary to examine the facts surrounding Bunch's participation as a witness before the hearing committee to properly evaluate this holding.

Dr. Bunch was called as a witness before that committee by Ritter. On direct examination, Bunch testified that he had known Ritter for approximately 8 years and had a high regard for him both personally and professionally. Bunch also testified on direct examination that summary suspension would not be justified if a doctor was delinquent in maintaining his patients' charts, but that failure to cooperate with staff "may" call for summary suspension.

The ARB concluded that the tubal ligation incident and a chart alteration by Ritter justified suspension of staff privileges. Bunch was queried about these matters on

cross-examination before the hearing committee. The Hospital's counsel asked Bunch a hypothetical question based on the Hospital's version of the facts relating to the chart alteration. Bunch knew that these allegations were unproven at that time. Assuming they were true, Bunch stated: "I think this is conduct unbecoming and unprofessional to a physician and it would have an effect on my feeling."

In response to hypothetical questions assuming the accuracy of the Hospital's version of the facts relating to the tubal ligation incident, Bunch stated: "I feel that this does expose a patient to risks that are not necessary. . . . My feeling is that the procedure should not be done, or should not be allowed, or should not be carried out without adequate assistance . . ." On redirect Bunch mitigated his comments, stating that it merely would have "been wise" if Ritter had used more assistants for the tubal ligation. Bunch's testimony further reveals that he talked with Ritter about his problems at the Hospital, and "felt very good at the time about his reaction."

In evaluating the claim that Bunch's participation on the ARB constituted unconstitutional prejudgment bias, it must be borne in mind that principles relating to disqualification are the same whether the proceeding is before a judge or an administrative body. *See Hill v. Department of Labor & Indus.,* 90 Wn.2d 276, 279, 580 P.2d 636 (1978). A judge is not presumed to be biased, *In re Borchert,* 57 Wn.2d 719, 722, 359 P.2d 789 (1961), and one alleging bias bears the burden of making an "affirmative showing" to that effect. *Williams & Mauseth Ins. Brokers, Inc. v. Chapple,* 11 Wn. App. 623, 628, 524 P.2d 431 (1974). It is especially appropriate that plaintiff bear this burden in this case, as it may be very difficult in a hospital with only seven physicians on its active staff to ensure some review by peers which is free of all prior knowledge or "feelings."

Mere exposure to adjudicative facts is not a basis for disqualification. *Withrow v. Larkin,* 421 U.S. 35, 55, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975). In *Withrow,* a doctor

claimed that he was deprived of due process because the same board which investigated charges of misconduct and found sufficient evidence to justify a contested hearing later decided the case. However, the board's earlier determination of "probable cause" for suspension did not amount to a prejudgment on the ultimate issues. In addition, no specific foundation was presented for suspecting that the board had been prejudiced by its investigation or would have been disabled from hearing and deciding on the basis of the evidence presented at the contested hearing. Therefore, the state officials were presumed to be acting with integrity, making the proceeding constitutionally proper.

Similarly, Dr. Bunch did not express his opinion directly or implicitly on whether the tubal ligation or chart alteration justified suspension. Not only did he refrain from commenting on that ultimate question, he never committed himself to any intermediate position such as by voting that probable cause for a suspension existed. As in *Withrow,* no specific grounds were shown for suspecting that Ritter's own witness had actually prejudged the propriety of suspension. A fortiori, there was no deprivation of due process. *See also Duffield v. Charleston Area Medical Center, Inc.,* 503 F.2d 512 (4th Cir. 1974) (where five members of the board suspending a physician's hospital privileges were also members of the tribunal which heard his appeal, due process was satisfied because the earlier decision was only tentative and the five obtained their exposure to the case only through the same proceeding); *Wilson v. Lincoln Redevelopment Corp.,* 488 F.2d 339, 343 (8th Cir. 1973) (committee member who voted to evict plaintiff from public housing at earlier proceeding not thereby disqualified where he had to assess new evidence and make a final decision); *Simard v. Board of Educ.,* 473 F.2d 988, 993 (2d Cir. 1973); 3 K. Davis, *supra* at 383, 385 (only when knowledge of the applicable adjudicative acts is coupled with an expressed definite opinion is disqualification required). While placing Dr. Bunch on the ARB may have not been the most prudent course, it was not basically unfair, *cf. United States*

*ex rel. Goldbaum v. Curran,* 298 F. 118, 120 (S.D.N.Y. 1924) (L. Hand, J.), and it accordingly was not violative of due process.

Finally, while we agree that Ritter was improperly summarily suspended because the medical staff bylaws require a hearing before suspension unless such an "action must be taken immediately in the best interests of patient care" (which was absent here), we do not agree with the trial court's conclusion of law that the Hospital commissioners' final decision (reached after reviewing the ARB report) to continue Ritter's suspension was arbitrary and capricious.

█ We will overturn a public hospital's decision denying an initial *grant* of hospital privileges only if the hospital's action is arbitrary, capricious, or discriminatory. *Group Health Coop. v. King County Medical Soc'y,* 39 Wn.2d 586, 669, 237 P.2d 737 (1951); *see Rao v. Board of County Comm'rs,* 80 Wn.2d 695, 698, 497 P.2d 591 (dictum), *cert. denied,* 409 U.S. 1017, 34 L. Ed. 2d 309, 93 S. Ct. 436 (1972). An identical rule should apply when privileges are withdrawn. No claim is made that the District acted in a discriminatory fashion. Its final decision therefore is invalid only if it was arbitrary or capricious.

Administrative action is not arbitrary or capricious if there are grounds for two or more reasonable opinions and the agency reached its decision honestly and with due consideration of the relevant circumstances. Such action is not arbitrary or capricious merely because an appellate court believes it would have reached a different decision on the same facts. *See, e.g., Barrie v. Kitsap County,* 93 Wn.2d 843, 850, 613 P.2d 1148 (1980). Our scope of review should be especially unobtrusive in this context given the gravity of interests at stake, the inherent difficulty of precisely defining fitness to be a member of a hospital staff, and the judiciary's limited capacity to question competently a hospital administration's discretion in such matters. *See Sosa v. Board of Managers,* 437 F.2d 173, 176–77 (5th Cir. 1971); *Shulman v. Washington Hosp. Center,* 222 F. Supp. 59, 64 (D.D.C. 1963); *Khan v. Suburban Community Hosp.,* 45

Ohio St. 2d 39, 44, 340 N.E.2d 398 (1976). "[S]o long as [initial] staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere." *Sosa,* at 177. There is no reason why judicial review should not be similarly limited when staff privileges are withdrawn.

The ARB found that Ritter's serious alteration of a patient's Hospital chart was grounds for suspension because such a practice (1) could put the accuracy of all Hospital records in question and (2) evidenced noncooperation with nursing and record–keeping staff. Such alterations are expressly prohibited by medical staff rules and regulations. This proscription is clearly reasonable, as other medical personnel often must make decisions based on such records. The medical staff bylaws also require an ability to cooperate and satisfactorily relate with others as a condition of continuing membership. This requirement is also rationally related to the effective functioning of a hospital. *See Rao v. Auburn Gen. Hosp.,* 19 Wn. App. 124, 127, 573 P.2d 834, *review denied,* 90 Wn.2d 1015 (1978); *Rao v. Auburn Gen. Hosp.,* 10 Wn. App. 361, 366, 517 P.2d 240 (1973). Applying the appropriately narrow standard of review, we are similarly unable to conclude that the District abused its discretion by finding that Ritter's questionable tubal ligation procedure justified suspension.

In conclusion, we hold that the District's violation of its own regulations invalidated Ritter's summary suspension, but that the District did not improperly permanently suspend Ritter's staff privileges after the administrative hearing and an appeal therefrom. We therefore reverse the trial court's judgment that Ritter "be reinstated to all clinical privileges and offices at Ritzville Memorial Hospital," and that all "documents and records" relating to the suspension proceeding be expunged.

STAFFORD, UTTER, DOLLIVER, WILLIAMS, and DIMMICK, JJ., concur.

DORE, J. (dissenting)—The majority held (1) that the 1–year staff privileges of a physician and surgeon can be summarily stripped without notice or hearing 4 months short of the 1–year appointment period, and that such firing does not violate his constitutional liberty and/or property rights and (2) that due process was complied with on Ritter's appeal even though two of the five members constituting the appellate tribunal, prior to the review, had expressed viewpoints antagonistic to Ritter's reinstatement.[1] I disagree with both holdings and dissent.

The majority at page 506 alleges that "Complaints were submitted to the staff executive committee about Ritter's *repeated* performance of surgery without a qualified assistant in violation of Hospital rules". (Italics mine.) This is false.[2] The subject case is the first and only time a complaint was made against Ritter regarding surgery.

The majority at page 510 states: "In the present case, Ritter's license was not revoked, nor was he otherwise 'prohibited from working in his chosen field'." To say that a physician and surgeon in a small town can continue in his chosen field while denying him the use of hospital facilities in a 1–hospital town illustrates the weakness of the majority's position.

The majority denies that Ritter had a 1–year employment contract with Ritzville Memorial Hospital, renewable at the end of each year. It concludes, "He [Ritter] appears to have had no more than a *subjective expectancy* of continued Hospital privileges." (Italics mine.) This statement

---

[1]Dr. Bunch testified on page 25 of the hearing committee transcript that: "I think this conduct is unbecoming, unprofessional to a physician and it would have an effect on my feelings".

[2]Finding of fact No. 11. "Prior to Dr. Ritter's summary suspension in August of 1978, the only occasion in which matters pertaining to Dr. Ritter's medical practice were referred to the Executive Committee of the Medical Staff of the Adams County Hospital District, with review, pursuant to Medical Staff By–Laws, occurred in February 1978 when Dr. Richard Bunch of that committee met with Dr. Ritter regarding the nursing staff's concerns about Dr. Ritter's use of the drug pitocin during child delivery procedures . . ."

finds no support in the record. It is undisputed that in December 1970 Ritter moved from Seattle, where he had practiced medicine for approximately 10 years, to Ritzville at the behest of the Ritzville community. Ritter, in his testimony at trial, related the event:

> I was in practice in Seattle at the time and Ritzville was without a resident physician. A number of people of the community formed a committee to seek a physician. They contacted me because I was interested and concerned about the fact that in rural areas of the United States they were being under served as far as the medical care, at least according to the journals I had been reading, and such. The committee persisted in trying to convince me that I should come to Ritzville.

Ritter, bowing to pressure, accepted the position and was granted staff privileges at the Ritzville Hospital for an initial 1–year period. Subsequently, he enjoyed a good reputation in Ritzville and was regarded highly by his patients. In the 12–month period prior to his suspension, he grossed over $250,000. Prior to his suspension, Ritter had been granted seven consecutive 1–year appointments at the Hospital.

To say that Ritter's giving up his home and practice in Seattle and moving to Ritzville doesn't constitute sufficient detriment to support a 1–year contract, is incredulous and contrary to the trial court's analysis.[3] *See Franklin v. Fischer,* 34 Wn.2d 342, 208 P.2d 902 (1949); *Burgesser v. Wendel,* 73 N.J.L. 286, 62 A. 994 (1906).

I would have held that (1) a physician's 1–year appoint-

---

[3]Conclusions of law.

"2. At the time of the summary suspension of his clinical appointment to the medical staff of the Ritzville Memorial Hospital in August of 1978, Dr. Ritter held a property interest to a one–year appointment to the medical staff at that Hospital, constituting an implied contract whereby for medical services rendered at Ritzville Hospital, the Hospital District accorded Dr. Ritter the right to admit and attend his patients at such hospital.

"3. The Hospital District's summary suspension of Dr. Ritter's clinical appointment, which did not expire until December 31, 1978, constitutes state action that deprived Dr. Ritter of a significant property interest in violation of the due process clause of the 14th Amendment of the United States Constitution."

ment to staff privileges at a public hospital gives rise to a protected liberty and property interest, (2) Dr. Ritter's liberty and property interests were not adequately safeguarded by the District's suspension procedure and he should be reinstated, and (3) the appearance of fairness doctrine applies to a public hospital district, its commissioners, hearing committee and appellate review body, during the procedures wherein a physician's hospital staff privileges are summarily suspended.

## PRESUSPENSION RELATIONSHIPS

Before his suspension, Ritter had been having some differences with the then Hospital Administrator, David Gleason. Gleason forwarded nurses' complaints regarding Ritter to the executive committee of the medical staff. After meeting with Ritter, the staff made recommendations to the nursing staff; no action was taken against Ritter. However, friction between Gleason and Ritter continued.

In June 1978, Gleason resigned. Ray McRae was appointed administrator. Nurse Carlson was directed at that time to assist in helping correct the situation with Ritter. The Board gave McRae specific instructions to cooperate with Ritter. At The Board meeting in early July 1978, McRae reported that everyone was getting along well.

On July 24, 1978, Ritter successfully performed a tubal ligation under local anesthetic without a full surgery crew. Ritter, in an apparent effort to cut costs, had determined that he did not need a full crew, although the supervisor of nurses felt the procedure was major surgery and required a qualified assistant. At that time, the District had no written rule or regulation which either defined "major surgery" or established when a full surgery crew was needed. When Nurse Carlson learned that Ritter was proceeding with only the assistance of his medex, she assisted Ritter in the operation.

McRae learned of the tubal ligation incident on July 25. McRae immediately ordered that no more operations be performed at the Hospital unless a full surgery crew was

present. Ritter abided by the new requirement, performing six surgical procedures without any reported problems between July 24 and August 17.

## SUMMARY DISMISSAL

In preparation for the next Board meeting, McRae reported the tubal ligation matter to the Board by mailing incident reports to them on August 14. At the August 17 meeting, McRae presented a number of problems relating to Ritter: the tubal ligation incident, chart alterations, delinquent charts, failure to cooperate with administration and staff, and violations of Hospital rules and regulations regarding the use of an unauthorized first assistant in surgery. The Board discussed alternative actions, then voted to summarily suspend Ritter's clinical privileges. Ritter was notified of the Board's decision 5 days after his suspension.

Ritter requested and was granted a hearing pursuant to the fair hearing plan. The hearing committee recommended that the tubal ligation surgery and one altered chart were grounds for immediate suspension. The Board accepted the recommendation and continued the suspension. Ritter then exercised his right of review before the Appellate Review Body (ARB). At the hearing before the ARB, Ritter unsuccessfully challenged the participation of Dr. Bunch on the basis of probable bias. The ARB found that the suspension was justified and should be continued.

Ritter filed a writ of review, pursuant to RCW 7.16.120, before the Superior Court for Spokane County. The trial court held, *inter alia,* that (1) Ritter had been deprived of his constitutionally protected liberty and property interests by not being accorded a *presuspension* hearing, (2) Ritter had been denied due process before the ARB by reason of a violation of the appearance of fairness doctrine relating to Bunch's dual role as witness before the hearing committee and as a member of the ARB, (3) the summary suspension of Ritter was arbitrary and capricious, (4) that the lawyer/ chairman, Walkinshaw, had not violated the appearance of fairness doctrine, and (5) Ritter was ordered reinstated to

all clinical privileges and offices at the Hospital.

The Hospital appealed the court's decision and Ritter cross–appealed the court's ruling on the lawyer/chairman's capacity to sit on the appeal board.

I. Dr. Ritter's appointment to staff privileges constituted constitutionally protected property interests.

The State may not deprive a person of a property interest without affording due process, by mandate of the fourteenth amendment to the United States Constitution. It is uncontested that the Board's acts constitute state action. There is no precise definition of what constitutes a "property interest" for due process purposes. The United States Supreme Court said of the term in the employment termination area:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth,* 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972). In *Roth,* the court found that a teacher's property interest in reemployment was created and defined by the terms of his appointment. No property interest was found because the contract failed to provide for renewal of the 1–year appointment.

The majority contends that because there is no property interest in public employment, there can be no property

interest in a right to practice one's employment in a certain building. Furthermore, the majority asserts that courts must defer to boards' judgments in physician termination cases. Such deference is based upon the importance placed on protection of the vital interests of the public. Courts should only interfere if staff privileges are granted to or denied doctors based on an "'arbitrary, tyrannical, or . . . fundamentally wrong basis.'" *Rao v. Board of County Comm'rs,* 80 Wn.2d 695, 698, 497 P.2d 591 (1972) quoting from *Group Health Coop. v. King County Medical Soc'y,* 39 Wn.2d 586, 237 P.2d 737 (1951).

The majority's cases can be easily distinguished. Ritter was not *applying for* staff privileges as were the doctors in the cases cited; rather, Ritter was *midterm in his clinical appointment* when he was summarily dismissed. Nor was Ritter suspended because the Board chose to rely upon the "advice of the medical staff". No medical staff opinion was either sought or considered before the Board suspended him.

In *Perry v. Sindermann,* 408 U.S. 593, 601, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972), a companion case to *Roth,* the Supreme Court stated:

> We have made clear in *Roth, supra,* at 571–572, that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." *Id.,* at 577. A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. *Ibid.*

Ritter's suspension from the exercise of his staff privileges occurred approximately 4 months prior to the expiration of his appointment. As such, under the reasoning of *Roth* and its progeny, Dr. Ritter had a legitimate claim of entitlement to his continued employment, at least for the duration of the 1978 calendar year.

II. The summary suspension of Dr. Ritter damaged his ability to practice medicine and put a stigma upon his name and reputation, giving rise to a constitutionally protected liberty interest.

The Fourteenth Amendment protects citizens from state deprivations of liberty interests without due process of law. The *Roth* court has given some meaning to the "liberty" concept, enumerating two circumstances which would trigger a person's liberty interests. First, where an employee has been discharged (or his contract not renewed), by reason of charges

> that might seriously damage his standing and associations in his community . . . for example, that he had been guilty of dishonesty, or immorality. . . . For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437.

(Citations omitted.) *Roth,* at 573. Second, through its decision not to rehire the employee, the State

> imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities . . . for example, . . . regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For "[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury. . . ." *Joint Anti–Fascist Refugee Committee* v. *McGrath* [341 U.S. 123], at 185 (Jackson, J., concurring).

*Roth,* at 573–74. We believe that Ritter's situation epitomizes the "different case" to which the *Roth* court referred.

The news of Ritter's suspension was reported in the local and regional press. The impact of the summary suspension was so great that at the age of 53 Dr. Ritter literally found himself unable to practice medicine in the Central Washington area. The trial court concluded:

> The Hospital District's summary suspension of Dr. Ritter's clinical appointment to the medical staff of the

Ritzville Memorial Hospital, without a prior hearing, deprived him of his liberty to pursue his chosen profession and imposed upon Dr. Ritter a stigma that called into question his good name, honor and integrity and effectively foreclosed Dr. Ritter's freedom to engage in the general practice of medicine in his practice area. Such deprivation of Dr. Ritter's good name, honor and integrity, without a prior hearing or opportunity to be heard, constituted state action by a state municipality that deprived him of his liberty interests in violation of the due process clause of the 14th Amendment of the United States Constitution.

The court's conclusion rested on abundant findings of fact, all of which are supported by substantial evidence.

Other courts have found that curtailment of a doctor's staff privileges may trigger due process protection based on the doctor's liberty interest. Harm to a doctor's reputation was a factor which the court considered in *Christhilf v. Annapolis Emergency Hosp. Ass'n,* 496 F.2d 174 (4th Cir. 1974) holding that a doctor's privileges in a specific medical area could not be limited without affording him procedural due process. In *Meredith v. Allen County War Memorial Hosp. Comm'n,* 397 F.2d 33 (6th Cir. 1968), five physicians wrote letters to the authorities complaining of certain acts of the plaintiff/doctor and recommending that he not be appointed to the staff. "The complaints did not question his professional ability, but were based on matters such as general uncooperativeness, refusal to handle emergency cases, and dismissal from various medical associations." *Meredith,* at 34. In holding that due process placed limitations on the physician's exclusion from practice, the court noted that

the stigma . . . would result from a dismissal on the grounds mentioned in the letters of defendant physicians . . . [and that t]he charges of uncooperativeness and the intimations of unethical behavior in the instant case reflect adversely on plaintiff's reputation . . .

*Meredith,* at 36. The charges leveled against Ritter—noncooperation, failure to adhere to Hospital rules and regulations, and performance of surgery without a qualified

assistant—are similar to the charges brought against the doctor in *Meredith* and due process requires the same limits on the procedure employed in excluding him from practice.

The second test of determining the presence of a liberty interest articulated in *Roth*—foreclosure from employment—is also present in Ritter's case. The findings of fact show that immediately after his suspension Dr. Ritter lost 25 percent of his patients, necessitating staff layoffs at his clinic. Additionally, Ritter lost his courtesy privileges at Odessa Hospital, and his application for staff privileges at Moses Lake Good Samaritan Hospital was put on hold until they received additional information on the Adams County suspension. Ritter's subsequent attempts to enroll in the United States Navy and the United States Air Force Physician Corps were similarly rebuffed for the same reason. In short, the summary suspension effectively deprived Ritter of the pursuit of his medical practice. He was forced to take low paying employment as a resident in training at the University of Southern California Medical School.

Other courts have considered *the degree* to which a doctor has been foreclosed from practice by state action. The more severe the deprivation, the more likely that the physician has a right to procedural due process. *Christhilf v. Annapolis Emergency Hosp. Ass'n, supra* at 178.

The trial court's findings reflect that a mortal blow was struck to Ritter's Ritzville practice. His liberty interests were triggered by both the derogation of his good name and reputation in the community and among his peers, and the preclusion of his right to practice at the Ritzville Memorial Hospital.

III. Dr. Ritter's liberty and property interests were not safeguarded by the District's suspension procedure.

The question remains whether Ritter's liberty and property interests were protected by the posttermination hearings. I would hold that these hearings were totally insufficient and Ritter was entitled to a presuspension

opportunity to be heard.

Inherent in the doctrine of due process is the concept that the hearing, to have meaning, must be afforded at some time before the final deprivation has taken place.

> A necessary element in due process is that the opportunity to defend must be given *at a time when it can be effective.* Unless the defense can speak *at a time when there is a chance to be heard fairly,* the opportunity to speak is a hollow one.

*Poe v. Charlotte Memorial Hosp., Inc.,* 374 F. Supp. 1302, 1311 (W.D.N.C. 1974); *Duffield v. Charleston Area Medical Center, Inc.,* 503 F.2d 512 (4th Cir. 1974). In *Groppi v. Leslie,* 404 U.S. 496, 502–03, 30 L. Ed. 2d 632, 92 S. Ct. 582 (1972), the court stated that

> [R]easonable notice of a charge and an opportunity to be heard in defense *before punishment is imposed* are "basic in our system of jurisprudence." . . . In *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306 (1950), the Court stated:
>
> > "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that *deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing* appropriate to the nature of the case." 339 U. S., at 313.

(Citations omitted. Italics mine.)

In *Mathews v. Eldridge,* 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), the court approved a full evidentiary hearing *after* a recipient's Social Security disability benefits were terminated. However, *prior to the initial termination* the recipient had been informed that the benefits might be terminated; was informed of the evidence on which the termination would be based; was allowed to review certain files, and was afforded an opportunity to respond in writing and submit additional evidence. Ritter was summarily suspended before being afforded *any* opportunity to be heard, and prior to even being apprised that any action so vital to his interests was to be considered.

In physician suspension cases, courts have looked to the severity of the loss to the doctor as well as to the governmental interest in the determinations of whether a posttermination hearing will be constitutionally valid. If an emergency exists, posing a danger to the patients, normal due process requirements are relaxed. *Citta v. Delaware Valley Hosp.*, 313 F. Supp. 301 (E.D. Pa. 1970); *Scappatura v. Baptist Hosp. of Phoenix,* 120 Ariz. 204, 584 P.2d 1195 (Ct. App. 1978). Based on the evidence, the trial court in the subject case found that

> neither the tubal ligation incident . . . nor the alleged . . . alteration of a medical chart by Dr. Ritter . . . created an emergency situation that required the immediate and summary suspension of Dr. Ritter's clinical appointment . . . in order to protect the best interests of patient care.

Although Ritter was afforded a full evidentiary hearing prior to the *final* decision by the Board to suspend his clinical privileges, he was denied due process of law. Due process safeguards necessary at the time of the initial suspension could have been relaxed if the District had shown that an emergency existed; however, no emergency was found.

I would hold that Ritter's rights were violated because the District failed to follow its own rules. Article 7, section 2 of the Hospital bylaws provides that the Board may only suspend a physician's clinical appointment without a prior hearing whenever "action must be taken immediately in the best interests of patient care". The trial court found that no medical staff advice was solicited by the Board concerning whether Ritter's medical practice and/or procedures posed an imminent threat to patient care. In addition, the trial court found that none of the three members of the Board believed there was an emergency meriting immediate suspension of Ritter's appointment. Finding of fact No. 31, based on undisputed evidence, states that the Board concluded its consideration of the allegations concerning Ritter by voting to immediately suspend Ritter for "continued

behavioral problems affecting risk management and for lack of cooperation with procedures". Not only were Dr. Ritter's constitutional rights violated, but the specific Hospital rules for suspension which he should have been able to rely upon were not observed. The majority stated, ". . . review procedures . . . comported with due process . . ." I say the majority junked the constitution in this case.

IV. The proceedings conducted by the Board were tainted with constitutionally impermissible prejudgment and bias.

The District contends that it was proper for Dr. Bunch, who previously had testified against Ritter, to sit on the ARB which reviewed his own and other persons' testimony. The trial judge found this violated Ritter's constitutional rights because prejudgment will deny due process.

The due process clause of the fourteenth amendment to the United States Constitution guaranteed Ritter a right to a hearing free from bias. This requires a fair hearing before impartial judges. *Hortonville Joint School Dist. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 49 L. Ed. 2d 1, 96 S. Ct. 2308 (1976). The subsequent ARB deliberations, as well as the initial hearing, must be fair and free from bias.

Our court has identified the types of bias which impermissibly taint judicial and quasi–judicial proceedings. In *Buell v. Bremerton*, 80 Wn.2d 518, 524, 495 P.2d 1358 (1972), the court held:

> At least three types of bias have been recognized as grounds for disqualification of persons performing quasi–judicial functions. These are prejudgment concerning issues of fact about parties in a particular case; partiality evidencing a personal bias or personal prejudice signifying an attitude for or against a party as distinguished from issues of law or policy; and, as alleged in this case, an interest whereby one stands to gain or lose by a decision either way.

(Footnotes omitted.)

The trial court found that while Dr. Bunch had no personal bias or pecuniary interest in the matter, he did pre-

judge critical facts. The prejudice resulting from such prejudgment occurs because the prior knowledge or prejudgment of the facts comes from one's former capacity rather than from one's capacity as an adjudicator. *NLRB v. Donnelly Garment Co.,* 330 U.S. 219, 91 L. Ed. 854, 67 S. Ct. 756 (1947). Dr. Bunch's participation on the ARB was a denial of Dr. Ritter's right to a fair and impartial hearing.

V. The appearance of fairness doctrine should have been applied to public hospital district's procedures for suspending staff physician's clinical privileges.

The courts of this state have an inherent constitutional power to review the acts of public officials which are alleged to be arbitrary and capricious, or in violation of fundamental rights. This is a power which cannot be abridged, even by the legislature. *State ex rel. Shannon v. Sponburgh,* 66 Wn.2d 135, 401 P.2d 635 (1965).

In reviewing the acts of public officials, our courts have developed the appearance of fairness doctrine, first articulated in *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969). In that case, we invalidated a zoning change because county commissioners permitted ex parte communications from proponents of the change, while they excluded comments from those opposed to the change. The rationale behind the doctrine is that an administrative body must be fair and free from prejudice and, *in addition,* it must have the appearance of being open–minded and fair. The public's confidence in governmental processes demands that there be such an appearance of fairness. *Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974).

Once limited to zoning and land use cases, the doctrine now has broader application. *See Hill v. Department of Labor & Indus.,* 90 Wn.2d 276, 580 P.2d 636 (1978); *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976). The courts of this state have inherent power to apply the appearance of fairness doctrine to hearings conducted by public officials

acting in a judicial or quasi–judicial manner. Certainly the public's interest in the governmental process which controls the practice of medicine in our public hospitals is of no less import than the rights of citizens in zoning changes.

To violate the appearance of fairness doctrine, there need not be shown any actual prejudice.

> The doctrine should not be limited to situations where blatant statements of advantage or influence have been made openly at a hearing, but must include those states of affairs where deliberations are blemished by the possibility of partiality . . .

*Fleck v. King County,* 16 Wn. App. 668, 672–73, 558 P.2d 254 (1977).

We agree with the trial court that the ARB's decision was void due to Dr. Bunch's double role. He appeared as a witness before the hearing committee and served as a member of the ARB which reviewed the hearing committee report. His dual participation violated the appearance of fairness doctrine.

### CROSS APPEAL

I would also have found that the participation of the lawyer/chairman in the Ritter appeal also violated the appearance of fairness doctrine.

Two months prior to Dr. Ritter's suspension the Washington Hospital Insurance Liability Fund had issued a report which was, in part, critical of surgical practices at Ritzville Hospital. After the hearing before the ARB had been completed, Dr. Ritter's counsel wrote a letter to ARB Chairman Walkinshaw in which counsel stated, "I have been advised by reliable sources that you are counsel for the hospital's insurer," and asked Chairman Walkinshaw for a ruling that the insurer's surgical practice report would not be considered by the ARB. He further advised that if Mr. Walkinshaw prohibited ARB consideration of that report, Dr. Ritter would not challenge his chairmanship of the ARB. Walkinshaw replied that the ARB had not considered the report. The trial court held that Ritter, through

his counsel, had not objected in a timely manner to Walkinshaw's participation based on his association with the fund and had, therefore, entirely waived his right to such a challenge. However, the court ruled the waiver did not operate to foreclose a challenge of Walkinshaw based on later discovered facts. At the time of the claimed waiver, it was unknown to Ritter that the lawyer/chairman, as attorney for the Washington Hospital Association, had advised the editor of the newsletter for that Association that if Dr. Ritter won his appeal before the Appellate Review Body, Dr. Ritter could bring a substantial damage action against the Hospital Association because of statements concerning the Ritter case that appeared in the Hospital Association newsletter.

The trial court found that Walkinshaw's pecuniary interest as a lawyer for the Washington State Hospital Association and the Washington Liability Insurance Fund was *too removed* from his position as chairman of the Appellate Review Body and, therefore, he didn't violate the appearance of fairness doctrine. I disagree.

I don't believe the chairman can sit on the subject appeal and wear two hats. How can he be open minded, objective and free of entangling influences while acting as a quasi-judicial official and simultaneously serving as the attorney for two insurance clients financially exposed on the result of Ritter's reinstatement? Presumably if the chairman voted to reinstate Ritter, he would be disloyal to his insurance clients, possibly exposing them to a multimillion–dollar lawsuit. If he so voted, they might even fire him. What chance, under the circumstances, did Ritter have on appeal? The majority says this is due process.

The appearance of fairness doctrine does not require a showing that actual influence was exerted to bring about the decision made, but only that some interest may have substantially influenced a board or commission member. *Fleck v. King County, supra* at 670.

The influence of Walkinshaw in the subject case was much more influential than a single vote. He was the chair-

man that conducted the hearing and as the only lawyer on the panel, presumably advised the others on the law and the significance and relevancy of evidence.

CONCLUSION

It is true that Ritter initially accepted the lawyer/chairman on the appellate panel even though he knew or suspected Walkinshaw's attorney role with the Hospital's insurer. However, Ritter was unaware that Walkinshaw had prejudged the case in reference to his client's exposure on a malpractice case, arising directly from the Ritter matter on appeal. He most certainly didn't waive this entanglement. *State ex rel. Madden v. PUD 1,* 83 Wn.2d 219, 517 P.2d 585 (1973). Why the chairman did not step aside I don't know. But I do know that by serving on the ARB tribunal judging Dr. Ritter, he violated the appearance of fairness doctrine and, therefore, the decision of the Appellate Review Body should be set aside.

I would have affirmed the trial court and, in addition, upheld the cross appeal.

ROSELLINI and HICKS, JJ., concur with DORE, J.

Reconsideration denied January 20, 1982.