[No. 37693-4-I.  Division One.  May 27, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT ALLEN WALLACE, *Appellant*.

---

[19]*Acheson*, 75 Wn. App. at 154.

*Darby N. DuComb* and *David Donnan* of *Washington Appellate Project*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Dana Cashman, Deputy*, for respondent.

Cox, J. — While in custody and awaiting sentencing on convictions for delivery and possession with intent to deliver cocaine, Robert Wallace received two liver transplants. The second was successful. Due to his medical condition, Wallace's sentencing hearing was continued twice over a period of 19 months. Wallace sought either a mitigated exceptional sentence or confinement at the University of Washington Medical Center. He also sought confinement under Washington's home detention statute, claiming that denial of this alternative to him violated equal protection of the law. The trial court ultimately sentenced Wallace to concurrent 36-month sentences on both counts, the low end of the standard range, at the Washington State Reformatory in Monroe. Wallace appeals the sentence.

We hold that the home detention statute does not violate the constitutional guaranty of equal protection of the law. Because we also reject Wallace's other challenges, we affirm.

At the time of Wallace's first scheduled sentencing hearing in March 1994, he was on a list for a liver transplant. He had been diagnosed with end-stage liver failure and had successfully completed the six-month alcohol and drug abstinence period required before the operation. According to Dr. Carithers, Wallace's physician, Wallace would have to report to the University of Washington Medical Center (UWMC) within two hours of notification to receive a new liver. The operation would be followed by two to three weeks of hospitalization and three months of follow-up at UWMC's outpatient clinics. The doctor expected Wallace to stabilize three to six months after surgery. Following stabilization, Wallace would require medication two to three times daily and would also need to see his physician every two weeks.

Dr. Carithers expressed concern that Wallace not face

the same situation a previous liver transplant patient at Monroe had faced. According to the doctor, the other patient had received inadequate care. The clinical transplant coordinator at UWMC expressed similar concerns. She added that a previous liver transplant patient housed at Monroe suffered two episodes of rejection following mismanagement of his medications by prison authorities.

The director of nursing services at the Washington State Reformatory indicated in a phone conversation with Wallace's counsel that Wallace would not have direct access to his UWMC physicians, but would need to go through four levels of approval to contact them. She stated that the prison hospital had no prior experience with liver transplant patients.

Wallace sought to serve his sentence at UWMC. Alternatively, he sought a mitigated exceptional sentence. The trial court continued sentencing for one year. It concluded that incarceration at that time or during Wallace's immediate post-operative care was insupportable. Noting that patients usually stabilize after approximately six months, it delayed the proceedings to hear expert opinion regarding the stability of Wallace's health after the operation.

In April 1995, the court once again heard the parties. Since March 1994, Wallace had undergone two liver transplants, the second of which was successful. He requested another continuance of the scheduled 1995 sentencing hearing so that he could collect the medical information necessary to present his case. The court granted this request.

The third and final hearing was in October 1995. Wallace presented several letters from Dr. Carithers expressing essentially two concerns. First, the doctor noted that Wallace was taking medication to suppress his immune system to reduce the chances of organ rejection. The medications render exposure to infections life-threatening. Second, Dr. Carithers reemphasized past difficulties communicating with prison officials to ensure that patients received their prescribed medicines and that prison staff

sent the required blood samples to UWMC for monitoring. The doctor again referred specifically to a liver transplant patient at Monroe as well as a federal prisoner who "developed life threatening complications because they were not given their immunosuppressive medications in a timely manner." He indicated that if Wallace's medicines are not administered as prescribed, his body will reject the liver within a few days. In addition, staff at UWMC must review Wallace's laboratory tests once a month. His liver and kidney functions must be closely monitored.

Dr. Brent Saetrum, the Medical Director for Monroe, testified for the State. He testified that there are University of Washington physicians on the staff, including two who work with Dr. Carithers on a regular basis, and one who does follow-ups on kidney transplants. These doctors do not work at the prison full-time, but are there on a regular basis. Although Dr. Saetrum has no experience working with liver transplant patients, another physician has such experience.

Since Dr. Saetrum joined the staff at Monroe, there have been no liver transplant patients. Moreover, the records do not show there ever have been any liver transplant patients at Monroe.

Dr. Saetrum noted that Monroe follows the University of Washington's state-of-the-art guidelines in caring for its immunosuppressed patients. UW physicians come in to see the patients one to four times per month. If any patient becomes endangered as a result of immunosuppression, Monroe's staff consults with inside and outside specialists. If necessary, the patient can be stabilized at Providence or UWMC, then returned to Monroe and isolated there as necessary.

Dr. Saetrum reviewed the materials from Dr. Carithers and addressed the latter's concern regarding the treatment Wallace might receive at Monroe. He indicated that communication between Monroe and UWMC is very direct. He testified that in the event of any deterioration in Wallace's condition, Monroe's staff would send him directly to UWMC "without hesitation."

Dr. Saetrum further indicated that Dr. Carithers' concerns regarding Wallace's medications were unwarranted. Dr. Saetrum could arrange, under certain circumstances, for Wallace to keep all of his medications with him except for two drugs that are considered contraband. He stated that because Wallace would be monitored at Monroe, he would be more certain to take his medications than he would be at home.

While Dr. Saetrum does not have authority to ensure that Wallace will be placed at Monroe, he could place Wallace in protective isolation once at Monroe. Inmates in the isolation facility wear protective gear if they have an infectious disease.

The court decided that Wallace could reject the transplanted liver no matter where he is, even if his medical care is perfect. It could not conclude that the State is unable to provide appropriate medical care. The court therefore sentenced Wallace to 36 months, the low end of the standard range. Wallace appeals.

## Equal Protection of the Law

Former RCW 9.94A.030(36), which was recodified in 1995 as RCW 9.94A.185, provides for a program of partial confinement that is available to certain offenders who are confined in a private residence. The statute states in pertinent part:

> Home detention may not be imposed for offenders convicted of a violent offense, any sex offense, any drug offense, reckless burning in the first or second degree as defined in RCW 9A.48.040 or 9A.48.050, assault in the third degree as defined in RCW 9A.36.031, assault of a child in the third degree, unlawful imprisonment as defined in RCW 9A.40.040, or harassment as defined in RCW 9A.46.020. Home detention may be imposed for offenders convicted of possession of a controlled substance (RCW 69.50.401(d)) or forged prescription for a controlled substance (RCW 69.50.403) if the offender fulfills the participation conditions set forth in this subsection and is monitored for drug use by treatment alternatives

to street crime (TASC) or a comparable court or agency-referred program.

The home detention program may also be made available to offenders whose charges and convictions do not otherwise disqualify them if medical or health-related conditions, concerns or treatment would be better addressed under the home detention program, or where the health and welfare of the offender, other inmates, or staff would be jeopardized by the offender's incarceration.[1] Participation in the home detention program for medical or health-related reasons is conditioned on the offender abiding by the rules of the home detention program and complying with court-ordered restitution.[2]

Wallace contends that the home detention statute denies him equal protection of the law. He claims the statutory classification, which generally excludes drug offenders but includes others who have committed "victimless" or single-victim crimes, is constitutionally flawed. We disagree.

Because Wallace does not differentiate between the equal protection clauses of the state and federal constitutions, we apply the analysis applicable to the Fourteenth Amendment.[3] Our first task is to determine which of three levels of scrutiny apply: strict scrutiny, intermediate scrutiny, or rational basis review.[4]

Strict scrutiny applies to a statute that creates an inherently suspect classification. Inherently suspect classifications are those based on race, national origin, or alienage.[5] Strict scrutiny is also applied where a party is threatened with deprivation of a fundamental right.

---

[1]Former RCW 9.94A.030(36)(b).

[2]Former RCW 9.94A.030(36)(b).

[3]*See In re Boot*, 130 Wn.2d 553, 572, 925 P.2d 964 (1996).

[4]*State v. Heiskell*, 129 Wn.2d 113, 123-24, 916 P.2d 366 (1996) (quoting *Westerman v. Cary*, 125 Wn.2d 277, 294-95, 892 P.2d 1067 (1994)).

[5]*Petersen v. State*, 100 Wn.2d 421, 444, 671 P.2d 230 (1983).

We apply intermediate scrutiny to a statute that creates a classification based on a semisuspect class, where an important right is involved.[6] An example is where the right to liberty is implicated and the classification is based on poverty.[7]

Rational basis review applies where there are no factors triggering more intensive scrutiny.[8]

Wallace first argues that we should apply the strict scrutiny test to strike down the home detention statute because there is a fundamental right to life and a prison sentence would lead to his death. Alternatively, he claims that the statute is invalid if we apply the rational basis test.

There is no inherently suspect classification (race, national origin, or alienage) in the home detention statute. Moreover, under the circumstances of this case, there is no threatened deprivation of the fundamental right to life. The trial court determined, and Wallace has not shown otherwise, that he is no more subject to loss of his life, due to his condition, in prison than elsewhere. Therefore, application of strict scrutiny is not warranted under the law.

Wallace does not expressly argue that intermediate scrutiny should apply. In any event, that test is also inapplicable. Wallace's postconviction interest in being confined at a particular facility is not a liberty interest and is severely limited. The U.S. Supreme Court has stated that

[e]very person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. But a person who *has* been so convicted is eligible

[6]*Heiskell*, 129 Wn.2d at 123 (quoting *Westerman*, 125 Wn.2d at 294-95).

[7]*Heiskell*, 129 Wn.2d at 123.

[8]*State v. Manussier*, 129 Wn.2d 652, 673, 921 P.2d 473 (1996), *cert. denied*, 117 S. Ct. 1563, 137 L. Ed 2d 709 (1997).

for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment.[9]

In addition, the Washington Supreme Court has held that a statutory classification that implicates a physical liberty interest will be given only intermediate scrutiny if it also affects a semisuspect class.[10] As there is no semisuspect class identified by the home detention statute, intermediate scrutiny is not applicable. Rational basis review applies here.

In *Heller v. Doe*,[11] the United States Supreme Court stated that under rational basis review

a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."

The State has no obligation to produce evidence to support the rationality of a classification.[12] A legislative choice may be based on rational speculation.[13] Where the classification in question is apparently the result of legislative line-drawing, these restraints on judicial review "have

---

[9]*Chapman v. United States*, 500 U.S. 453, 465, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991) (citations omitted). The court goes on to note that equal protection analysis "essentially duplicates" an argument based on due process. *See also In re Young*, 95 Wn.2d 216, 227, 622 P.2d 373 (1980) (holding that prisoners do not have a liberty interest for purpose of Fourteenth Amendment due process analysis with respect to transfers from one prison facility to another, absent a "reasonable expectation grounded in state law that he will not be transferred except upon a finding of certain facts . . . .").

[10]*State v. Thorne*, 129 Wn.2d 736, 771, 921 P.2d 514 (1996).

[11]509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993)).

[12]*Heller*, 509 U.S. at 320.

[13]*Beach Communications*, 508 U.S. at 315.

added force."[14] The Legislature is not required to address all evils in the same field at once, but "may select one phase of one field and apply a remedy there, neglecting the others."[15]

The State argues that the distinction between drug dealers and criminals covered by the home detention statute is rationally related to the state's interest in protecting the public from the spread of drug use. It points to statistics indicating the extent of the drug problem.[16] It is possible that the Legislature feared the results of allowing any convicted felon, regardless of the seriousness or pervasiveness of her crime, to spend her sentence at home. The Legislature may not have excluded all serious and pervasive crimes from the statute, but equal protection does not require it to address all evils of the same class at once.[17] The State's rationale for the distinction between drug dealers and other offenders is integral to the purpose of the statute.

Wallace contends that the purpose of the home detention statute is to save the state money and to protect the health of offenders and the prison population. He argues that there is no rational relationship between the exclusion of drug dealers and this purpose.

The statute itself refutes this argument. It provides that participation in home detention is conditioned upon the prisoner's participation in employment, school, or parenting. In addition, prisoners whose health-related conditions would be better addressed at home may participate if their "charges and convictions do not otherwise disqualify them." Clearly, protecting prisoner health is not the sole

---

[14]*Beach Communications*, 508 U.S. at 315.

[15]*Beach Communications*, 508 U.S. at 316.

[16]Br. of Resp't at 23 (citing National Narcotics Intelligence Consumers Comm., *The NNICC Report, 1985-1986* (1987)).

[17]*Griffin v. Eller*, 130 Wn.2d 58, 66, 922 P.2d 788 (1996) (citing *O'Hartigan v. Department of Personnel*, 118 Wn.2d 111, 124, 821 P.2d 44 (1991) (quoting *Railway Express Agency v. People of State of N.Y.*, 336 U.S. 106, 110, 69 S. Ct. 463, 93 L. Ed. 533 (1949))).

or even the main purpose of the statute. Rather, it appears that the Legislature found that certain classes of prisoners would be better served in a home detention program.[18] It balanced the nature of the various crimes against the costs and benefits of imprisonment and decided that some crimes do not warrant the costs of imprisonment in certain cases.

Taken to its limit, Wallace's argument would allow first degree murderers with health problems to qualify for home detention. Surely this was not the intent of the Legislature.[19]

■ Wallace also argues, without citation to authority, that to survive minimal scrutiny, a statutory classification must be related to the purpose of the statute itself. He maintains that the interest identified by the State is not the purpose of the statute. He contends that the court in *State v. Clark*,[20] which the State cites in response, erroneously applied the minimal scrutiny test by relying on the purpose of a statute different from the one under equal protection attack to determine the State's interest. We need not address arguments that are not supported by citation to authority.[21] In any event, we have already addressed why the classification is related to the purpose of the home detention statute.

We hold that the home detention statute does not violate equal protection.

---

[18]*See State v. Parker*, 76 Wn. App. 747, 749, 888 P.2d 167 (1995) (describing home detention as "cost effective alternative to total confinement").

[19]*See* LAWS OF 1988, ch. 154, enacting the original home detention provision. The governor vetoed section 1 of the bill which specifically stated that partial confinement would be limited to "appropriate offenders" under the statute, but in doing so stated that "[t]his bill contains reasonable provisions preventing use of home detention for persons who committed violent crimes and other offenses where the court feels the public or victims would be at risk." LAWS OF 1988, ch. 154, at 637.

[20]76 Wn. App. 150, 156-57, 883 P.2d 333 (1994), *aff'd*, 129 Wn.2d 211, 916 P.2d 384 (1996) (holding that a statute providing for a waiver of standard sentencing for first time offenders that excluded offenders convicted of delivering narcotic substances passed minimal scrutiny because the classification related to the state's interest in controlling the problems created by such drugs).

[21]*In re Elec. Lightwave, Inc.*, 123 Wn.2d 530, 545, 869 P.2d 1045 (1994).

We affirm the sentence.

The remainder of this opinion has no precedential value and will not be published.[22]

GROSSE and AGID, JJ., concur.

Review denied at 133 Wn.2d 1028 (1997).